UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:26-cv-02533

THE GEO GROUP, INC.,

Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado Department of Public Health & Environment (CDPHE), in her official capacity;

JEFF LAWRENCE, Director of the Environmental Health and Sustainability Division of CDPHE, in his official capacity;

PHIL WEISER, Colorado Attorney General, in his official capacity;

KELLY WEIDENBACH, Executive Director of the Adams County Health Department, in her official capacity;

Defendants.

---

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

---

For its Complaint against Defendants, Plaintiff The GEO Group, Inc. ("GEO"), by and through undersigned counsel, hereby submits this Complaint for Declaratory and Injunctive Relief, and states as follows:

## NATURE OF THIS ACTION

1.     GEO brings this action for declaratory and injunctive relief against Defendants Jill Hunsaker Ryan, Executive Director of the Colorado Department of Public Health & Environment ("CDPHE"), in her official capacity; Jeff Lawrence, Director of the Environmental Health and Sustainability Division of CDPHE, in his official capacity; Phil Weiser, Colorado Attorney General, in his official capacity; and Kelly Weidenbach, Executive Director of the Adams County Health Department, in her official capacity.

2.     GEO seeks a declaration concerning the legality of, and an order preliminarily and permanently enjoining the implementation and enforcement of, various provisions of Colorado House Bill 26-1276 ("HB 1276"). These provisions are preempted by federal law and impermissibly attempt to directly regulate and control federal immigration operations of the United States. They therefore violate the Supremacy Clause of the United States Constitution. They also impair GEO's contracts with the United States, in violation of the Contracts Clause of the United States Constitution.

3.     It is a core constitutional principle that "the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 426 (1819). Based on this principle, the Supreme Court has long recognized that "the activities of Federal Government *are free from regulation by any state*." *Mayo v. United States*, 319 U.S.

441, 445 (1943) (emphasis added); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) (Marshall, C.J.) (explaining that the Supremacy Clause ensures that States cannot enact laws that "interfere with, or are contrary to the laws of Congress"). Similarly, the Supreme Court recognizes the power of Congress to preempt inconsistent state laws as a "fundamental principle of the Constitution." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

4.     The State of Colorado, through HB 1276, has ignored these principles. The state claims the authority to empower state and local officials to directly regulate—and impose civil penalties on—facilities used by the United States Government to securely detain noncitizens who are subject to removal from the country. Thus, the state claims the authority to exercise state regulatory power over an area that is exclusively the province of the United States Government. It cannot do so under the Constitution.

5.     There is no question that the Federal Government has the power to detain individuals in anticipation of, or as a consequence of, federal immigration proceedings. *See, e.g., Wong v. United States*, 163 U.S. 228, 235 (1896). Nor can there be any question that the Federal Government has authority to contract with private entities to carry out its detention responsibilities. Indeed, Congress has enacted statutes that expressly authorize the Executive Branch to house federal detainees in private facilities as that Branch deems appropriate, and conduct all necessary oversight and investigations of the conditions within those facilities. *See, e.g.*, 6 U.S.C. § 112(b)(2); 6 U.S.C. § 205(b)(5); 8 U.S.C. § 1231(g); 18 U.S.C. § 4013; 28 U.S.C. § 530C(a)(4).

6.     The provisions of state law at issue here have the purpose and effect of making it more difficult for federal immigration officers to carry out their responsibilities in Colorado and

Page 2

impose direct burdens and requirements on facilities used in immigration operations. The Supremacy Clause does not allow Colorado to obstruct the United States' ability to enforce laws that Congress has enacted or to take actions entrusted to the Federal Government by the Constitution. Accordingly, the provisions at issue here are invalid.

7.    The provisions of HB 1276 are separately invalid because they impermissibly impair the obligations of GEO's contract with the federal government and thus violate the Contracts Clause of the United States Constitution.

8.    GEO, as the federal contractor responsible for providing secure detention services at the only operational federal immigration detention facility in Colorado, is imminently threatened by HB 1276. Accordingly, GEO brings this action seeking an order declaring the challenged sections of HB 1276 unconstitutional and entering a preliminary and permanent injunction restraining Defendants from implementing or enforcing HB 1276 against GEO.

**PARTIES**

9.    Plaintiff The GEO Group, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

10.    Defendant Jill Hunsaker Ryan ("Hunsaker Ryan") is named in her official capacity as the Executive Director of the CDPHE. Hunsaker Ryan has oversight of CDPHE. HB 1276 attempts to empower CDPHE to "inspect or investigate" the federal detention facility at issue here, to impose direct regulations on that facility, and to adopt rules governing the facility.

11.    Defendant Jeff Lawrence ("Lawrence") is named in his official capacity of the Director of the Environmental Health and Sustainability Division of CDPHE. That division is

responsible for implementing provisions of HB 1276 regulating the federal detention facility at issue.

12.     Defendant Phil Weiser ("Weiser") is named in his official capacity as the Colorado Attorney General. He is the "chief legal representative of the state." Colo. Rev. Stat. § 24-31-101. HB 1276 purportedly provides explicit enforcement authority to Weiser, including by empowering him to impose severe financial penalties for failure to comply with HB 1276's provisions that impose regulatory requirements on the federal detention facility at issue. In light of these duties, Attorney General Weiser is sued in his official capacity.

13.     Defendant Kelly Weidenbach ("Weidenbach") is named in her official capacity as the Executive Director of the Adams County Health Department. Weidenbach has oversight of the Adams County Health Department, which has been responsible for managing investigations related to epidemics or communicable diseases at the federal detention facility as set forth in HB 1276. In light of these responsibilities, Weidenbach is sued in her official capacity.

## JURISDICTION AND VENUE

14.     GEO seeks relief on all claims pursuant to 28 U.S.C. §§ 2201, 2202, and 2412, and 42 U.S.C. § 1983.

15.     This Court has jurisdiction under 28 U.S.C. § 1331 because the questions of whether HB 1276 violates the Supremacy Clause of the United States Constitution, whether it is preempted by federal law, and whether it violates the Constitution's Contracts Clause are federal questions. All claims set forth in this complaint are based on federal questions.

16.     This Court also has jurisdiction under 28 U.S.C. § 1332 because The GEO Group, Inc. and the Defendants are citizens of different states and the value of the declaratory and injunctive relief sought by GEO exceeds $75,000.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred, or a substantial part of the property that is the subject of this action is situated, in this District. GEO's Aurora ICE Processing Center ("AIPC"), located at 3130 North Oakland Street, Aurora, Colorado, is located in this District, and the effects of HB 1276 will be felt in this District.

<strong>FACTUAL ALLEGATIONS</strong>

**I.      HB 1276**

18.     On February 19, 2026, House Bill 26-1276 was introduced in the Colorado General Assembly. It was revised on May 8, 2026, and rerevised on May 11, 2026.

19.     On June 3, 2026, the rerevised HB 1276 was signed by the leadership of the Colorado General Assembly, and on June 4, 2026, it was signed by Governor Polis.

20.     HB 1276 amended and created various new sections of the Colorado Revised Statutes (primarily C.R.S. §§ 25-1-506, 25-1.5-101, and 24-31-101) relating to immigration detention facilities.

21.     Notably, HB 1276 Section 2 amends C.R.S. § 25-1-506 and purports to provide County or district public health agencies the following authority:

**25-1-506. County or district public health agency.**

(3) (b) In addition to other powers and duties, an agency HAS the following duties:***
(XVI) IN ITS DISCRETION, TO INSPECT OR EXAMINE A FACILITY THAT HOUSES OR DETAINS INDIVIDUALS WHO ARE NONCITIZENS

Page 5

FOR PURPOSES OF CIVIL IMMIGRATION PROCEEDINGS.

22.      HB 1276 Section 3 amends C.R.S. § 25-1.5-101 regarding the Colorado

Department of Public Health and Environment (CDPHE) as follows:

(i) (I) (D) With respect to any A facility that houses or detains INDIVIDUALS WHO ARE noncitizens for purposes of civil immigration proceedings, THE inspections and examinations must be made annually, and additional unannounced inspections AND EXAMINATIONS MUST be conducted after the annual inspection. UNANNOUNCED INSPECTIONS AND EXAMINATIONS MUST BE MADE AT LEAST ONE TIME EVERY THREE MONTHS, AND MAY BE MADE MORE FREQUENTLY, AND THE FACILITY SHALL PAY FOR THE INSPECTIONS AND EXAMINATIONS. THE INSPECTIONS AND EXAMINATIONS MADE PURSUANT TO THIS SUBSECTION (1)(i)(I)(D) MUST INCLUDE A REVIEW OF THE FOLLOWING: ADHERENCE TO FOOD SAFETY STANDARDS AND DRINKING WATER QUALITY STANDARDS, CONFINEMENT CONDITIONS, AND STANDARDS OF CARE PROVIDED TO INDIVIDUALS WHO ARE DETAINED IN THE FACILITY. THE FACILITY SHALL PROVIDE TO A DEPARTMENT REPRESENTATIVE WHO IS CONDUCTING AN INSPECTION OR EXAMINATION PURSUANT TO THIS SUBSECTION (1)(i)(I)(D), OR AN INVESTIGATION RELATED TO AN EPIDEMIC OR COMMUNICABLE DISEASE, ALL ACCESS NECESSARY TO PERFORM THE INSPECTION OR INVESTIGATION, INCLUDING ACCESS TO PEOPLE WHO ARE DETAINED, RECORDS, FACILITY OFFICIALS, AND FACILITY PERSONNEL. IF A FACILITY REFUSES TO ALLOW AN INSPECTION OR INVESTIGATION RELATED TO AN EPIDEMIC OR COMMUNICABLE DISEASE, THE FACILITY IS LIABLE FOR A CIVIL PENALTY OF NOT MORE THAN FIFTY THOUSAND DOLLARS FOR EACH REFUSAL. THE ATTORNEY GENERAL MAY BRING AN ACTION TO ENFORCE THIS SUBSECTION (1)(i)(I)(D), INCLUDING AN ACTION SEEKING A CIVIL PENALTY. ANY CIVIL PENALTY MONEY COLLECTED PURSUANT TO THIS SUBSECTION (1)(i)(I)(D) MUST BE TRANSFERRED TO THE STATE TREASURER, WHO SHALL CREDIT THE MONEY TO THE IMMIGRATION LEGAL DEFENSE FUND ESTABLISHED PURSUANT TO SECTION 8-3.8-101. THE DEPARTMENT MAY ADOPT RULES IT DETERMINES ARE NECESSARY FOR PURPOSES OF THIS SUBSECTION (1)(i)(I)(D). THIS SUBSECTION (1)(i)(I)(D) APPLIES TO A LOCAL, COUNTY, OR PRIVATE FACILITY THAT HOUSES OR DETAINS INDIVIDUALS WHO ARE NONCITIZENS FOR PURPOSES OF CIVIL IMMIGRATION PROCEEDINGS, INCLUDING A FACILITY THAT IS OPERATED ON BEHALF OF OR PURSUANT TO A CONTRACT WITH FEDERAL IMMIGRATION AUTHORITIES. THIS

SUBSECTION (1)(i)(I)(D) DOES NOT APPLY TO DETENTION FACILITIES OPERATED DIRECTLY BY THE FEDERAL GOVERNMENT.

(dd)(I) WITH RESPECT TO A FACILITY THAT HOUSES OR DETAINS INDIVIDUALS WHO ARE NONCITIZENS FOR PURPOSES OF CIVIL IMMIGRATION PROCEEDINGS, THE POWER TO REQUIRE THE FACILITY TO:

(A)    PROVIDE TO THE DEPARTMENT A YEARLY REPORT DETAILING THE FOLLOWING: THE OUTCOMES OF PREGNANT INDIVIDUALS IN THE FACILITY, OUTCOMES OF INDIVIDUALS WITH CHRONIC HEALTH CONDITIONS, OUTCOMES OF INDIVIDUALS WITH DISABILITIES, ACCESS TO FOOD FOR INDIVIDUALS WITH DIETARY RESTRICTIONS, AVERAGE TEMPERATURE WITHIN THE FACILITY, HIGHEST AND LOWEST TEMPERATURES RECORDED WITHIN THE FACILITY, INDIVIDUALS' ACCESS TO AN ATTORNEY, AND INDIVIDUALS' ACCESS TO SPACES OF WORSHIP OR SILENT REFLECTION;

(B) PROHIBIT THE HOUSING OR DETENTION OF A MINOR IN THE SAME ROOM AS A NONFAMILIAL ADULT; AND

(C) ON THE FACILITY'S SITE AND AT ALL TIMES, STAFF THE FACILITY WITH MEDICAL PROFESSIONALS AND MENTAL HEALTH PROFESSIONALS WHO ARE ACCESSIBLE TO INDIVIDUALS WHO ARE NONCITIZENS AND DETAINED FOR PURPOSES OF CIVIL IMMIGRATION PROCEEDINGS.

(II) (A) IF A FACILITY FAILS TO COMPLY WITH A REQUIREMENT IMPOSED BY THE DEPARTMENT PURSUANT TO THIS SUBSECTION (1)(dd), THE FACILITY IS LIABLE FOR A CIVIL PENALTY OF NOT MORE THAN FIFTY THOUSAND DOLLARS FOR EACH VIOLATION.

(B) THE ATTORNEY GENERAL MAY BRING AN ACTION TO ENFORCE THIS SUBSECTION (1)(dd), INCLUDING AN ACTION SEEKING A CIVIL PENALTY.

(C) ANY CIVIL PENALTY MONEY COLLECTED PURSUANT TO THIS SUBSECTION (1)(dd) MUST BE TRANSFERRED TO THE STATE TREASURER, WHO SHALL CREDIT THE MONEY TO THE IMMIGRATION LEGAL DEFENSE FUND ESTABLISHED PURSUANT TO SECTION 8-3.8-101.

(III)    ON OR BEFORE JANUARY 15, 2027, AND ON OR BEFORE

JANUARY 15 EACH YEAR THEREAFTER, THE DEPARTMENT SHALL SUBMIT A REPORT TO THE ATTORNEY GENERAL REGARDING FACILITIES' COMPLIANCE WITH THIS SUBSECTION (1)(dd) AND INFORMATION COLLECTED PURSUANT TO SUBSECTION (1)(dd)(I)(A) OF THIS SECTION. THE DEPARTMENT SHALL MAKE THE REPORT AVAILABLE ON A PUBLIC-FACING PAGE ON THE DEPARTMENT'S WEBSITE.

(IV) THIS SUBSECTION (1)(dd) APPLIES TO LOCAL, COUNTY, OR PRIVATE DETENTION FACILITIES THAT HOUSE OR DETAIN INDIVIDUALS WHO ARE NONCITIZENS FOR PURPOSES OF CIVIL IMMIGRATION PROCEEDINGS, INCLUDING ANY FACILITY THAT IS OPERATED ON BEHALF OF OR PURSUANT TO A CONTRACT WITH FEDERAL IMMIGRATION AUTHORITIES. THIS SUBSECTION (1)(dd) DOES NOT APPLY TO DETENTION FACILITIES OPERATED DIRECTLY BY THE FEDERAL GOVERNMENT.

(V)(A). THE DEPARTMENT MAY ADOPT RULES IT DETERMINES ARE NECESSARY FOR PURPOSES OF THIS SUBSECTION.

(B) THE DEPARTMENT SHALL SET FEES FOR INSPECTIONS AND EXAMINATIONS PURSUANT TO SUBSECTION (1)(i)(I)(D) OF THIS SECTION.

* * *

(VII) AS USED IN THIS SUBSECTION (1)(dd), UNLESS THE CONTEXT OTHERWISE REQUIRES:

(A) "MEDICAL PROFESSIONAL" MEANS AN ADVANCED PRACTICE REGISTERED NURSE REGISTERED PURSUANT TO SECTION 12-255-111, A PHYSICIAN ASSISTANT LICENSED PURSUANT TO SECTION 12-240-113, OR A MEDICAL DOCTOR OR DOCTOR OF OSTEOPATHY LICENSED PURSUANT TO ARTICLE 240 OF TITLE 12.

(B) "MENTAL HEALTH PROFESSIONAL" MEANS A MENTAL HEALTH PROFESSIONAL LICENSED OR CERTIFIED PURSUANT TO ARTICLE 245 OF TITLE 12, AN ADVANCED PRACTICE REGISTERED NURSE REGISTERED PURSUANT TO SECTION 12-255-111 WITH TRAINING IN SUBSTANCE USE DISORDERS OR MENTAL HEALTH, OR A PHYSICIAN ASSISTANT LICENSED PURSUANT TO SECTION 12-240-113 WITH TRAINING IN SUBSTANCE USE DISORDERS OR MENTAL HEALTH. "MENTAL HEALTH PROFESSIONAL" DOES NOT MEAN AN UNLICENSED PSYCHOTHERAPIST AS DEFINED IN SECTION 12-245-202.

23.     The statute applies to any "facility that is operated on behalf of or pursuant to a contract with Federal immigration authorities." There is only one such facility presently in Colorado. *See* Leg. Council Staff, *Fiscal Note for HB 26-1276* at 4 (May 5, 2026), https://leg.colorado.gov/bill_files/115839/download ("As of May 2026, one facility in the state operates as a detention center" and that the "one existing detention center in the state is federally contracted with a private operator and is therefore subject to the bill's inspection provisions."), *available at:* https://leg.colorado.gov/bill_files/115839/download.[1]

## II.    IMMIGRATION AND CUSTOMS ENFORCEMENT DETENTION FACILITIES

24.     In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[2] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement (ICE) in March 2007.[3]

25.     Congress has authorized or required the detention of aliens under several different statutes. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 583 U.S. 281, 285-90 (2018).

---

[1] *See also* N. Coltrain, *New Colorado laws require health inspections of ICE facilities, aim to reduce cost of homeowners insurance*, Denver Post (June 4, 2026) ("Only one detention center currently operates in Colorado — a privately run facility in Aurora owned by the Geo Group and contracted by U.S. Immigration and Customs Enforcement.").

[2] *See* Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002).

[3] *Name Change From the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement*, 72 Fed. Reg. 20,131 (April 23, 2007).

26.     Congress has granted the Secretary of Homeland Security broad authority "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties. Congress has also granted the Secretary authority to "carr[y] out," "in [his] reasonable discretion," the activities of ICE "through any means, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," except to the extent that such agreements are otherwise precluded by federal law. 28 U.S.C. § 530C(a)(4) (emphasis added).

27.     Congress has also directed that "[t]he [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id*. § 1231(g)(2).

28.     Finally, in 2000, Congress enacted a statute stating: "Notwithstanding any other provision of law, . . . the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013, Statutory Note "Contracts for Space or Facilities."[4]

---

[4] Although 8 U.S.C. § 1231(g)(1), 28 U.S.C. § 530C(a)(4), and the note accompanying 18 U.S.C. § 4013 all mention the "Attorney General," the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the immigration-enforcement functions and programs of INS to the Secretary of Homeland Security, *see* 6 U.S.C. § 202(3); *id*. § 251(2); 8 U.S.C. § 1103(a)(1); provided that the Secretary "shall have all functions relating to the [INS] that any other official could by law exercise in relation to the agency immediately before such transfer," 6 U.S.C. § 551(d)(2); and specified that for those transferred functions "reference in any other

29.     Thus, Congress has granted ICE, the Secretary's designee, the discretion to use private contractor detention or incarceration space or facilities and services to fulfill its statutory immigration detention obligations. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

30.     Pursuant to this authority, ICE "manages the nation's civil immigration detention system."[5]

31.     However, ICE directly owns very few detention centers, and those too are typically run by contractors. *See, e.g.*, *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 319-20 (3d Cir. 2025) (the Federal Government "often relies" on private immigration-detention centers and that ICE "does not build its own lockups, and it does not operate them alone. Instead, it contracts with private companies or local governments to help run them."); *Xirum v. U.S. Immigration & Customs Enf't*, Case No. 12-cv-00801, 2024 WL 3718145, at *3 (S.D. Ind. Aug. 8, 2024) ("While ICE maintains the largest civil detention system in the United States, the agency does not own or operate most of the facilities it uses." (internal quotations omitted)).

---

Federal law to any … officer … the functions of which are so transferred shall be deemed to refer to the Secretary," 6 U.S.C. § 557. Therefore, to the extent the provisions cited above relate to immigration detention and removal, their references to the "Attorney General" now refer to the Secretary. *See, e.g.*, *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019) (explaining that the mention of the "Attorney General" in 8 U.S.C. § 1231(g)(1) refers to the Secretary); *cf. Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[5] U.S. Immigr. & Customs Enf't, *Detention Management*, *available at*: https://www.ice.gov/detain/detention-management.

### III.    THE AURORA ICE PROCESSING CENTER

32.    There is currently one operational ICE detention facility in the State of Colorado, the Aurora ICE Processing Center ("AIPC") (a/k/a Denver Contract Detention Facility) at 3130 North Oakland Street in Aurora, with an operational capacity for 1,532 beds.

33.    AIPC provides federal immigration detention and processing services pursuant to a contract between GEO and United States Immigration and Customs Enforcement.

34.    The current Contract No. 70CDCR22D00000001 (the "Contract" or "AIPC Contract") was awarded on October 15, 2021, with a period of performance from October 16, 2021 through October 15, 2026.

35.    The AIPC is a Department of Homeland Security-controlled detention facility. As noted in the AIPC Contract, "[t]he Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) is responsible for the detention, health, welfare, transportation, and deportation of detainees in removal proceedings, and those subject to a final order of removal from the United States." AIPC Contract at 31.[6]

36.    ICE and the Department of Justice maintain an extensive daily presence at and operational oversight of AIPC. In accordance with the requirement of the AIPC Contract, AIPC includes dedicated facilities occupied by ICE, as well as the Aurora Immigration Court, which falls under the jurisdiction of the Office of the Chief Immigration Judge, a component of the Executive Office for Immigration Review within the Department of Justice. *See* AIPC Contract at 32-36.

---

[6] Citations to the AIPC Contract are to the PDF pages of the document attached as Exhibit A to the Motion for Preliminary Injunction filed with this Complaint.

37.    The AIPC Contract contains extensive detail regarding ICE occupancy requirements. For example:

**3. Executive Office for Immigration Review (EOIR) Space**
The Contractor shall refer to ICE/EOIR Design Standards (Addendum A - ICE/EOIR Design Standards) for courtrooms, offices, and workstation sizes, and specific furnishing requirements. All furniture and case goods shall be furnished by the Contractor in accordance with ICE Design Standards.

The Contractor must provide the following:
   a)  3 Courtrooms and accompanying office and support space as per the EOIR Design Standards. Each courtroom should have the capability to hold live court as well as hold video teleconferencing court.
   b)  5 Offices (see Standards for size)
   c)  13 Workstations (see Standards for size)
   d)  Separate entrance for judges required with complete security system and access to parking lot. Must be ADA compliant.
   e)  IT system/space as per the EOIR Design Standards.

**4. ICE Administrative Space**
The Contractor is required to provide ICE Office and Support Space at or immediately adjacent to the Contractor provided detention facility.

All office, administrative, support and multiple use space shall be complete with appropriate electrical, communication, and phone/fax/VTC connections. VTC connections shall use a PRI (T1) connection at a minimum.

a)  Administrative office and support space for ICE enforcement staff of approximately 39 employees, including:

   - 1 - Officer in Charge (OIC) (1 office - 120 sqft min)
   - 1 - Assistant Field Office Director (AFOD) (1 office - 120 sqft min)
   - 4 - Supervisory Detention and Deportation Officer (SDDO) (4 offices - 100 sqft
   - min per office)
   - 12 - Detention Officer (DO) (6 offices - 100 sqft min per office)
   - 9 - Enforcement and Removal Assistant (ERA) (9 offices - 100 sqft min per office)
   - 1 - Bond Control Specialist (BCS) (1 office - 100 sqft min)
   - 1 - Mission Support Specialist (MSS) (1 office - 100 sqft min)
   - 1 - Contracting Officer's Representative (COR) (1 office - 100 sqft min)

Page 13

- 1 - Detention Standard Compliance Officer (DSCO) (1 office - 100 sqft min)
- 1 - CMCO (1 office - 100 sqft min)
- 1 - IHSC Field Medical Coordinator (1 office - 100 sqft min)
- 5 - Office of the Principal Legal Advisor (OPLA) (5 offices - 100 sqft min per office)
- 1 - Custody Resource Coordinator (CRC) (1 office - 100 sqft min)

b) Additional administrative areas for ICE enforcement staff:
- Break room with kitchenette (i.e., small food storage/preparation area including a refrigerator, microwave and sink at a minimum)
- Storage/Secure File Room
- Interview Room
- Conference Room (with VTC capability)
- Secure File Room
- VTC Room
- Copier/Fax/Printer/Shredder Area
- Male Restroom (not used/shared with detainees/inmates)
- Female Restroom (not used/shared with detainees/inmates)

All furniture shall be furnished by the Contractor.

AIPC Contract at 34-35.

38.    The AIPC Contract specifically provides that all facility records are the property

of the Federal Government:

The Contractor shall safeguard all records related to the operation of the facility. ***All records will remain the property of the U.S. Government.***

AIPC Contract at 44 (emphasis added).

39.    The AIPC Contract also specifically provides that ICE approval is required before

the release of any ICE documents, including all information about detainees:

There shall be no public disclosures regarding this contract made by the Contractor (or any subcontractors) without review and approval of such disclosure by ICE Office of Public Affairs and express permission granted by the CO. The Government considers such information privileged or confidential.

Page 14

> In the event of third-party litigation pertaining to the services performed at the facility, the Contractor will notify the Contracting Officer promptly (within 2-business days) of the existence of a lawsuit against the Contractor. The Contractor will coordinate and seek review and approval from ICE before release of any ICE-documents, including information about detainees, in discovery.

AIPC Contract at 43.

## IV. THE PERFORMANCE BASED NATIONAL DETENTION STANDARDS ("PBNDS")

40.    GEO's performance of the AIPC Contract is subject to numerous requirements that mandate strict adherence to hundreds of federal regulations and standards, including the Performance Based National Detention Standards ("PBNDS"). *See* U.S. Immigr. & Customs Enf't, 2011 PBNDS (rev. Dec. 2016) ("2011 PBNDS"), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

41.    In response to the Congressional mandate to identify "appropriate" facilities, 8 U.S.C. § 1231(g)(1), federal immigration regulations identify qualifying criteria for entities contracted to provide detention services. Chief among those is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates the PBNDS. *See* 8 C.F.R. § 235.3(e); *see also Pimentel-Estrada v. Barr*, 458 F.Supp.3d 1226, 1235 (W.D. Wash. 2020) ("GEO is required to maintain conditions at the NWIPC in accordance with the Performance-Based National Detention Standards 2011."); *Lyon v. U.S. Immigr. & Customs Enf't*, 171 F.Supp.3d 961, 990 (N.D. Cal. 2016) (noting that facilities must comply with the pertinent PBNDS standards); *D.A. v. United States*, 663 F.Supp.3d 715, 740 (W.D. Tex. 2023) (finding compliance with PBNDS is "non-discretionary duty").

42.    The PBNDS set forth extensive and detailed requirements for contractors housing ICE detainees. Contractors are expected to implement all standards in the PBNDS and are regularly audited to ensure compliance. *See* AIPC Contract at 2.

43.    The current PBNDS were implemented at the direction of Congress. The Joint Explanatory Statement and House Report 114-668, which accompany the Fiscal Year (FY) 2017 Department of Homeland Security (DHS) Appropriations Act (P.L. 115-31) evince this direction. The Joint Explanatory Statement says: "Within 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions…." 163 Cong. Rec. H3812 (2017). House Report 114-668 states: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance." H.R. Rep. No. 114-668, at 35 (2016).

44.    As part of a consolidated appropriations act, Congress restricted ICE's expenditure of federal detention funds to ensure that contracted facilities comply with the PBNDS. *See* Pub. L. No. 110-329, Div. D, Tit. II (Sep. 30, 2008), 122 Stat. 3574. Congress also provided that no federal detention funds "may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." *Id*. (emphasis added); *see also Xirum*, 2024 WL 3718145, at *3.

45.     The "Preface" to the PBNDS provides, *inter alia*:

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. *Detention is an important and necessary part of immigration enforcement.* Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. *ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law.*

The PBNDS 2011 reflect ICE's ongoing effort to *tailor the conditions of immigration detention to its unique purpose.*

2011 PBNDS Preface.

46.     The PBNDS applicable to AIPC are approximately 450 pages in length and include detailed standards governing facility operations in the following categories: (1) Safety, including detailed requirements relating to Emergency Plans, Environmental Health and Safety, and Transportation; (2) Security, including detailed requirements relating to Admission and Release, Custody Classification, Contraband, Facility Security and Control, Funds and Personal Property, Hold Rooms in Detention Facilities, Key and Lock Control, Population Counts, Post Orders, Searches of Detainees, Sexual Abuse and Assault Prevention and Intervention, Special Management Units, Staff-Detainee Communication, Tool Control, Use of Force and Restraints; (3) Order, including detailed requirements relating to Disciplinary System; (4) Care, including detailed requirements relating to Food Service, Hunger Strikes, Medical Care, Medical Care (Women), Personal Hygiene, Significant Self-Harm and Suicide Prevention and Intervention, Terminal Illness, Advance Directives and Death, Disability Identification, and Assessment and Accommodation; (5) Activities, including detailed requirements relating to Correspondence and Other Mail, Trips for Non-Medical Emergencies, Marriage Requests, Recreation, Religious

Practices, Telephone Access, Visitation, and Voluntary Work Program; (6) Justice, including

detailed requirements relating to Detainee Handbook, Grievance System, Law Library and Legal

Materials, and Legal Rights Group Presentations; and (7) Administration and Management,

including detailed requirements relating to Detention Files, Interviews and Tours, Staff Training,

Detainee Transfers, and Definitions. *See generally* 2011 PBNDS.

## V.    ICE CONTROL OVER AIPC ACCESS

47.    The AIPC Contract specifically provides that ICE exercises exclusive control over

access to secure portions of the AIPC:

> In implementing its mission, [ICE Enforcement and Removal Operations] is
> responsible for carrying out all orders for the securing and departure activities of
> detainees who are designated in removal proceedings and for arranging for the
> detention of detainees when such becomes necessary and prescribed by law.

* * *

> The detainee shall be kept under constant supervision. Public contact is prohibited unless
> authorized in advance by the [Contracting Officer's Representative, a Federal Government
> Official] or designated ICE official.

* * *

> The Contractor shall comply with all the PBNDS 2011 (REV. 2016) pertaining to
> the security and control of the detention facilities.

AIPC Contract at 31, 40, 90.

48.    Similarly, the PBNDS expressly vest ICE—***not GEO***—with authority over access

to secure portions of detention facilities. The PBNDS contain detailed provisions governing

visits by third parties that all require coordination with and approval by ICE Enforcement and

Removal Operations ("ERO") personnel. For instance, the PBNDS require that "[f]acilities shall

notify and seek approval from ERO of any proposed law enforcement officer visit with a

Page 18

detainee." 2011 PBNDS, § 5.7, V.N.2. In addition, visits by media and non-governmental organizations shall be permitted only "with prior approval of the respective ERO Field Office Director." *Id.* § 7.2 V.A.1. And requests by NGOs and other stakeholders, including intergovernmental entities, must be submitted in writing to the local ERO Field Office. *Id.* § 7.2, V.B.

## VI.    ICE AIPC FACILITY STAFFING REQUIREMENTS

49.    The AIPC Contract sets out detailed facility staffing and qualification requirements, which ***cannot be changed without ICE approval***:

The Contractor shall provide a staffing plan that addresses at a minimum the staffing requirements and key personnel to be employed in connection with this contract as outlined in the PWS. The Contractor shall staff the post positions in accordance with the Contractor- submitted and Government-approved Contractor Staffing Plan to include relief factors and the agreed upon detainee ramp schedule.

The number, type, and distribution of staff as described in the contract-staffing plan shall be maintained throughout the term of the contract. *Written requests to change the number, type, and/or distribution of staff described in the staffing plan must be submitted to the CO, through the COR, for approval prior to implementation.*

Staffing levels shall not fall below a monthly average of 85% for custody staff, 80% for health services and 85% for all other departments of the total ICE-approved staffing plan. The approved staffing levels for detention/correctional officers (custody staff) shall not fall below a monthly average of 85%. Staffing levels for all departments other than custody and health services will be calculated in the aggregate.

Each month, the Contractor shall submit to the COR the current average monthly vacancy rate and indicate any individual positions that have been vacant more than 60 days. Failure to fill any individual position within 60 days of the vacancy may result in a deduction by the CO from the monthly invoice if the vacancy in combination with other vacancies regardless of duration brings staffing levels below 85% for custody staff, 80% for health services and 85% for all other departments.

AIPC Contract at 47 (emphasis added).

50.    Additional detailed staffing requirements, including the specification of suitable credentials for various positions, are set forth in the AIPC Contract. AIPC Contract at 48-50.

## VII.    COMPREHENSIVE GRIEVANCE SYSTEM AND FEDERAL OVERSIGHT OF AIPC

51.    The PBNDS applicable to the current operation of AIPC include a lengthy and detailed detainee grievance system that includes (1) informal grievances; (2) emergency grievances that involve an immediate threat to health, safety, or welfare pursuant to which medical emergencies must immediately be brought to the attention of proper medical personnel; (3) formal written grievances; and (4) medical grievances. Formal and medical grievance determinations by the grievance officer ("GO") may be appealed to the grievance appeals board ("GAB"), which must issue a written decision. If the detainee remains unsatisfied, further appeal is allowed to the facility administrator (who may sometimes act in conjunction with the Field Office Director), who must issue a decision within five days. If the grievance involves a medical issue, it is submitted to medical personnel and must be responded to within five days, and, if appealed to the GAB, at least one member of the GAB must be a medical professional. And facilities "shall allow any ICE/ERO detainee dissatisfied with the facility's response to a grievance or those fearing retaliation to be able to appeal or communicate directly with ICE/ERO." *See* 2011 PBNDS, § 6.2.

52.    In addition to the detailed mandatory federal grievance requirements in the PBNDS, in 2019 Congress created a specific mechanism for oversight and enforcement of the "sound conditions and care" required by the national detention standards when it created the Office of the Immigration Detention Ombudsman ("OIDO") to, *inter alia*, investigate complaints

Page 20

and conduct investigations of any alleged violations of the federal "detention standards." 6 U.S.C. § 205(b)(5).

53. The OIDO is only one part of a "robust and multilevel oversight and compliance program" that includes daily federal on-site monitoring and compliance reviews of immigration detention operations:

> As part of its critical mission, ICE ERO ensures that each of its detention facilities adhere to the national detention standards that govern facility operations and protect the health, safety and well-being of all aliens in its custody.

> Regardless of whether detention facilities are owned and operated by ICE, a state or local entity, or a contractor, each detention facility operates under one of several sets of ICE national detention standards which describe a facility's immigration detention responsibilities, explain what detainee services a facility must provide, and identify what a facility must do to ensure a safe and secure detention environment for staff and aliens in detention***

> To ensure compliance with each contract's terms and conditions and the applicable detention standards, ICE and the Department of Homeland Security (DHS) employ a robust and multilevel oversight and compliance program. At the agency level, ICE ERO Detention Service Managers (DSMs) and Detention Standards Compliance Officers (DSCOs) monitor detention conditions through daily on-site compliance reviews to identify deficiencies, areas of concern, contract and facility issues, and to facilitate corrective actions.
>
> * * *
>
> ICE and DHS provide oversight to ICE ERO detention facility inspections. Inspections and audits are conducted by the DHS Office of the Inspector General, the DHS Office of the Immigration Detention Ombudsman, and the ICE Office of Detention Oversight within ICE's Office of Professional Responsibility.

> In addition, the DHS Office of Civil Rights and Civil Liberties conducts on-site investigations to address allegations made by detained aliens and other stakeholders. These multiple channels of oversight allow ICE to provide a high standard of care for the detained population.

> Detention facilities are subject to regular inspections by ICE ERO's third-party inspection contractor. In May 2018, ICE began posting all facility inspection reports submitted by the third-party contractor. The reports are posted below in chronological order within 60 days of inspection.

U.S. Immigr. & Customs Enf't, *Facility Inspections*, https://www.ice.gov/detain/facility-

inspections.

**VIII.   ICE ENFORCEMENT OF CONTRACTUAL REQUIREMENTS, FEDERAL REGULATIONS, AND OTHER STANDARDS**

54.    The AIPC Contract includes an ICE Quality Assurance Surveillance Plan

("QASP"), which ICE uses to enforce GEO's compliance with applicable federal regulations,

standards, and contractual requirements. AIPC Contract at 773-781.

55.    Relevant sections of the AIPC Contract regarding the ICE QASP specifically

note:

> The role of the Government in quality assurance is to ensure performance standards as well as all contractual requirements are achieved and maintained.

> \* \* \*

> This QASP is designed to provide an effective surveillance method to monitor the Contractor's performance relative to the requirements listed in the Contract. The QASP illustrates the systematic method the Government (or its designated representative) will use to evaluate the services the Contractor is required to furnish.

> This QASP is based on the premise the Government will validate that the Contractor is complying with ERO-mandated quality standards in operating and maintaining detention facilities. Performance standards address all facets of detainee handling, including safety, health, legal rights, facility and records management, etc. Good management by the Contractor and use of an approved QCP will ensure that the Facility is operating within acceptable quality levels.

AIPC Contract at 127.

56.    The ICE QASP notes that ICE will use various methods to monitor and

investigate GEO's compliance with applicable requirements:

> ICE will monitor the Contractor's compliance with the Performance Standards as well as the contractual requirements (Sections C-J including contract attachments) using a variety of methods. All facilities will be subject to a full annual inspection, which will include a review of the Contractor's QCP activities. In addition, ICE

may conduct additional routine, follow-up, or unscheduled ad hoc inspections as necessary (for instance, as a result of unusual incidents or data reflected in routine monitoring). ICE may also maintain an on-site presence in some facilities in order to conduct more regular or frequent monitoring. Inspections and monitoring may involve direct observation of facility conditions and operations, review of documentation (including QCP reports), and/or interviews of facility personnel and detainees.

AIPC Contract at 129.

57.    The ICE QASP provides ICE with various mechanisms to ensure compliance with contractual requirements and applicable regulations and standards, including withholdings and deductions:

> **Withholding**: Amount of monthly invoice payment withheld pending correction of a deficiency. See Attachment A for information on the percentages of an invoice amount that may be withheld for each functional area. Funds withheld from payment are recoverable (See Sections 7 and 8) if the COR and Contracting Officer confirm resolution or correction and should be included in the next month's invoice.

> **Deduction:** Funds may be deducted from a monthly invoice for an egregious act or event, or if the same deficiency continues to occur in accordance with the percentages listed in Attachment 18A - Performance Requirements Summary. The Contractor will be notified immediately if such a situation arises. The Contracting Officer in consultation with the ERO will determine the amount of the deduction. Amounts deducted are not recoverable.

AIPC Contract at 128.

58.    Various Federal Acquisition Regulations included in the AIPC Contract provide additional mechanisms for ICE to enforce compliance with contractual requirements and applicable regulations and standards. *See* 48 C.F.R. §§ 52.252-2; 42.1502; 52.211-11; 52.249-8.

59.    The AIPC Contract notes the various options available to ICE in the event of contractor non-compliance with applicable requirements, including the termination of the Contract:

> The rights of the Government and remedies described in this section are in addition

to all other rights and remedies set forth in the contract. Specifically, the Government reserves its rights under the Inspection of Services and Termination clauses. Any reductions/deductions in the Contractor's invoice shall reflect the contract's reduced value resulting from the Contractor's failure to perform required services pursuant to the contract's Quality Assurance Surveillance Plan (QASP) and/or the Performance Requirements Summary (PRS). The Contractor shall not be relieved of full performance of the services hereunder and may be terminated for default based upon inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

AIPC Contract at 46.

## IX.    FINANCIAL IMPACT OF HB 1276

60.    HB 1276 mandates, *inter alia*, frequent inspections occurring at least one time every three months, and inspections could be more frequent. Indeed, one of the sponsors of the legislation has commented: "We won't let the federal government operate . . . detention centers without oversight, and our bill ensures facilities are regularly inspected."[7] And a different sponsor of the bill has commented that HB 1276 is about "ensuring frequent inspections."[8] Frequent and unpredictable inspections alone will increase the cost to, and administrative burden on, GEO and the federal government.

61.    In addition, HB 1276 mandates that specific personnel be present on-site 24/7, which exceeds the PBNDS requirements. This will separately increase the cost to GEO.

---

[7] *See* R. Tann, *Colorado governor vetoes bill that would have allowed lawsuits against federal immigration officers, signs another to regulate detention centers*, Sky-Hi News (June 4, 2026), https://www.skyhinews.com/news/colorado-gov-jared-polis-vetoes-bill-federal-immigration-detention-center.

[8] *See* M. Ventrelli, *Gov. Polis signs bill expanding state inspection authority over Colorado's immigration detention centers*, Denver Gazette (June 4, 2026), https://www.denvergazette.com/2026/06/04/gov-polis-signs-bill-expanding-state-inspection-authority-over-colorados-immigration-detention-centers.

62.    Lastly, if GEO does not allow an inspection whenever the state desires—even though GEO legally does not control admission to the facility—the State can levy a penalty of up to $50,000 on GEO for each instance in which ICE does not permit an inspector to enter. Similarly, GEO faces penalties of up to $50,000 for each instance in which it does not comply with the direct regulatory requirements HB 1276 purports to impose on the AIPC.

**COUNT I:**
**VIOLATION OF INTERGOVERNMENTAL IMMUNITY**
**(DIRECT REGULATION OF THE FEDERAL GOVERNMENT)**

63.    Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

64.    GEO, as a contractor for the United States, enjoys and is clothed with the Federal Government's intergovernmental immunity. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180-81 (1988); *CoreCivic v. Governor of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

65.    Under the Supremacy Clause of the United States Constitution, "the activities of the Federal government are free from regulation by any state." *Mayo*, 319 U.S. at 445. State laws run afoul of intergovernmental immunity when they "involve[] a direct, physical interference with federal activities . . . or some direct, immediate burden on the performance of the [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). When state regulation of a contractor would control federal operations, "[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) (en banc).

Page 25

66.    By purporting to override ICE's authority and control over access to, oversight of, and regulation of the AIPC, C.R.S. § 25-1.5-101 as amended by HB 1276 Section 3, and C.R.S. § 25-1-506 as amended by HB 1276 Section 2, substantially interfere with Federal Government operations and place immediate burdens on the performance of federal functions.

67.    By purporting to override ICE's authority to specify contractor qualifications and staffing requirements set out in ICE's AIPC Contract with GEO, C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, substantially interferes with Federal Government operations and places immediate burdens on the performance of federal functions.

68.    By purporting to grant authority to the state and its agencies to impose monetary fines against GEO in connection with the performance of the AIPC Contract, C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, substantially interferes with Federal Government operations and places immediate burdens on the performance of federal functions.

69.    By purporting to empower state agencies to prescribe operational requirements regarding numerous aspects of a federal private detention facility, C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, substantially interferes with Federal Government operations and places immediate burdens on the performance of federal functions.

70.    Congress has not authorized the State of Colorado to regulate the Federal Government's activities with respect to contracted federal detention facilities like the AIPC.

71.    C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, are unconstitutional and invalid as applied to GEO's operations of the AIPC on behalf of ICE because they directly regulate the United States'

operation of federal detention facilities. *United States v. Washington*, 596 U.S. 832 (2022); *Movassaghi*, 768 F.3d 832.

## COUNT II:
## VIOLATION OF INTERGOVERNMENTAL IMMUNITY
## (IMPERMISSIBLE DISCRIMINATION)

72.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

73.     Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445. Accordingly, state laws are invalid if they "regulate[ ] the United States directly or discriminate[ ] against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *CoreCivic*, 145 F.4th at 321; *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). "A state or local law discriminates against the federal government if it treats someone else better than it treats the government." *Arcata*, 629 F.3d at 991 (internal quotation marks omitted).

74.     A state law "discriminates" against the federal government or its contractors, for purposes of the intergovernmental immunity doctrine, if it singles them out for less favorable "treatment," or if it regulates them unfavorably on some basis related to their governmental "status." *Washington*, 596 U.S. at 839 (*quoting North Dakota*, 495 U.S. at 438).

75.     The language of HB 1276 unmistakably reveals that it was specifically designed to target and impose unique burdens on the AIPC—while specifically exempting other similarly situated Colorado state facilities.

76.     The Legislative Council Staff Fiscal Note accompanying HB 1276 states that "[a]s of May 2026, one facility in the state operates as a detention center" and that the "one

existing detention center in the state is federally contracted with a private operator and is therefore subject to the bill's inspection provisions."

77.    No other comparable Colorado state correctional or detention facility is subject to the requirements and enforcement regime contained in C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2.

78.    C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, are unconstitutional and invalid as applied to GEO's operations of the AIPC on behalf of ICE because they impermissibly discriminate against the federal government and its contractors. *Washington*, 596 U.S. 832.

**COUNT III**
**FEDERAL PREEMPTION**
**(FIELD/ DOMINANT INTEREST PREEMPTION)**

79.    Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

80.    Federal immigration law provides that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and "[w]hen United States facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the [Secretary] may expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g)(1). Congress has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" before beginning any project to develop a new detention facility. 8 U.S.C. § 1231(g)(2) (emphasis added).

Page 28

81.     In enacting Section 1231(g)(1), "Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986); *see also Van Rinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (noting that § 1231(g)(1) mandates the Attorney General to "arrange for appropriate places of detention for aliens detained pending removal").

82.     To effectively arrange for appropriate places of detention for removal aliens, Congress further granted the Secretary authority "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties.

83.     Congress further authorized the Secretary, in his "reasonable discretion," to carry out the immigration enforcement activities of the Department of Homeland Security "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4).

84.     Congress has also authorized the Secretary to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013 note "Contracts for Space or Facilities" (emphasis added).

85.     The current federal ICE contract for the AIPC facility and related services includes numerous requirements that mandate strict adherence to hundreds of federal regulations and standards. ICE mandates, *inter alia*, that all its contractors (state and private) operate in conformance with the PBNDS. And the PBNDS set forth extensive and detailed requirements for

contractors housing ICE detainees. Contractors are expected to implement all standards in the PBNDS and are regularly audited to ensure compliance.

86.     In response to the Congressional mandate to identify "appropriate" facilities, 8 U.S.C. § 1231(g)(1), federal immigration regulations identify qualifying criteria for entities contracted to provide detention services. Chief among those is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates the PBNDS. 8 C.F.R. § 235.3(e); *Pimentel-Estrada*, 458 F.Supp.3d at 1235; *Lyon*, 171 F. Supp. 3d at 990; *D.A.*, 663 F.Supp.3d at 740 (finding compliance with PBNDS is "non-discretionary duty").

87.     The current PBNDS were implemented at the direction of Congress. *See, e.g.*, 163 Cong. Rec. H3812 (2017) ("Within 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions…"). H.R. Rep. No. 114-668 at 35 (2016) ( "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS . . . including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance").

88.     As part of a consolidated appropriations act, Congress restricted ICE's expenditure of federal detention funds to ensure that contracted facilities comply with the PBNDS. *See* Pub. L. No. 110-329, Div. D, Tit. II (Sep. 30, 2008), 122 Stat. 3574. Congress also provided that no federal detention funds "may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than 'adequate' or the equivalent median score in any subsequent performance evaluation system." *Id.* (emphasis added); *Xirum*, 2024 WL 3718145, at *3.

*89.*    The PBNDS applicable to AIPC are approximately 450 pages in length, and include lengthy, detailed standards governing the safety, security, activities, and care of detainees, as well as various administrative requirements, as detailed above. *See generally* 2011 PBNDS.

90.    In 2019 Congress also adopted 6 U.S.C. § 205, creating the OIDO to inspect, investigate, and hear and resolve complaints regarding compliance with the health and safety standards imposed by the PBNDS on federal immigration detention facilities.

91.    The comprehensive framework enacted by Congress regarding the detention and care of aliens pending removal leads to the conclusion that the Federal Government has occupied the field. *See Arizona v. United States*, 567 U.S. 387 (2012); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003); *see also* Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085, 2098-2099, 2107 (2000).

92.    Where Congress occupies an entire field, as it has in the field of alien detention pending removal, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards. *See Arizona*, 567 U.S. at 401 (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 249 (1984)).

93.    The doctrine of field preemption also applies to "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Arizona*, 567 U.S. at 399. This version of field preemption also has roots in the arena of immigration. *Hines v. Davidowitz*, 312 U.S. 52 (1941). As explained in *Hines*, the detention of aliens

implicates both the federal government's interest in a "uniform" immigration system and in the conduct of foreign relations. *Id.* at 64-66; *see also Arizona*, 567 U.S. at 395 (noting that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States"); *see generally* U.S. Const. art. I, § 8, cl. 3-4, 10-13. Concern for orderly immigration and for the reciprocal treatment of United States citizens detained abroad "make the treatment of aliens, in whatever state they may be located, a matter of national moment." *Davidowitz*, 312 U.S. at 73. Thus, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Matthews v. Diaz*, 426 U.S. 67, 81 n.17 (1976). The conditions of confinement are therefore the quintessential "field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230.

94.     Where Congress delegates broad discretion to an Executive Branch official to achieve some end, state laws are preempted when they frustrate the natural effect of that delegation and blunt the consequences of Executive acts taken pursuant to the delegation. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-377 (2000).

95.     Federal statutory directives and a comprehensive set of federal detention standards govern the operation of ICE's private detention facilities, including every aspect of federal immigration detention covered by C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2.

96.     C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, are unconstitutional and invalid as applied to GEO's

operations of the AIPC on behalf of ICE because they are preempted by Congress' occupation of the entire field of alien detention pending removal, a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

**COUNT IV:**
**FEDERAL PREEMPTION**
**(CONFLICT/ OBSTACLE PREEMPTION)**

97.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

98.     Stated simply, "acts of the State Legislatures . . . [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause. *Gibbons*, 22 U.S. at 211; *see also Hines*, 312 U.S. at 67 ("in considering the validity of state laws in the light of treaties or federal laws touching the same subject," the Court's function at bottom is to determine whether a challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

99.     In cases where federal and state law conflict, "federal law prevails and state law is preempted." *Murphy v. NCAA*, 584 U.S. 463, 471 (2018). Local law will also be found to be preempted by federal law whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Perez v. Campbell*, 402 U.S. 637, 649 (1971) (*quoting Hines*, 312 U.S. at 67); *see also Rust v. Johnson*, 597 F.2d 174, 179 (9th Cir.) (local government cannot override federal interest even though local government was engaged in valid state function), *cert. denied*, 444 U.S. 964 (1979).

100.    Compliance with the access and inspection requirements contained in C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, and those contained in the current ICE contract and PBNDS applicable to AIPC is impossible because of direct conflicts.

101.    The enforcement regime contained in C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, constitutes an obstacle to Congress' purpose for creating a uniform federal framework for the oversight of the detention of aliens pending removal and ICE's contractual and regulatory enforcement regime.

102.    Any attempt by a state to impose qualification, licensing, permitting, or similar requirements on federal contractors impermissibly frustrates the objectives of federal procurement laws in violation of the Supremacy Clause.

103.    The applicable provisions of the Federal Acquisition Regulations ("FAR"), which govern federal procurement of goods and services, 48 C.F.R. § 1.000 *et seq*., mandate that, before awarding a contract, the agency must affirmatively determine that the bidder is "responsible," 48 C.F.R. § 9.103(b).

104.    In order to make that responsibility determination, the agency must conclude that the contractor has, among other things, "adequate financial resources to perform the contract, or the ability to obtain them," 48 C.F.R. § 9.104-1(a); "a satisfactory performance record," 48 C.F.R. § 9.104-1(c); a "satisfactory record of integrity and business ethics," 48 C.F.R. § 9.104-1(d); and "the necessary production, construction, and technical equipment and facilities, or the ability to obtain them." 48 C.F.R. § 9.104-1(f).

105.    The FAR further requires the agency to determine that the individual is "otherwise qualified and eligible to receive an award under applicable laws and regulations." 48 C.F.R. § 9.104-1(g).

106.    The Supreme Court held that state licensing laws cannot be applied to federal contractors because "[s]ubjecting a federal contractor to the [state] contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." *Leslie Miller v. Arkansas*, 352 U.S. 187, 190 (1956).

107.    As the Ninth Circuit noted in *Geo Grp., Inc.*, 50 F.4th at 758:

There is "no important difference" for Supremacy Clause purposes between a state "requir[ing] a permit" and "order[ing] compliance with state regulations." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n.3, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). "In both settings the State is claiming the authority to dictate the manner in which the federal function is carried out." *Id*.

108.    C.R.S. § 25-1.5-101 as amended by HB 1276 Section 3 and C.R.S. § 25-1-506 as amended by HB 1276 Section 2 are unconstitutional and invalid as applied to GEO's operations at the AIPC on behalf of ICE because they impermissibly grant the state virtual power of review over the federal determination of contractor qualification and responsibility.

109.    The requirements contained in C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, are unconstitutional and invalid as applied to GEO's performance of the AIPC Contract on behalf of ICE because they impermissibly conflict with the current ICE contract and PBNDS applicable to the AIPC and create obstacles to Congress' purpose of creating a uniform federal framework for the detention of aliens pending removal.

**COUNT V:**
**VIOLATION OF THE CONTRACTS CLAUSE**

110.    Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

111.    Article 1, Section 10 of the United States Constitution expressly provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

112.    By imposing requirements and obligations on GEO's operation of AIPC that are inconsistent with and directly conflict with GEO's federal contract with ICE, compliance with C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, will force GEO to breach its contract with ICE and, therefore, operates to substantially impair that contractual relationship.

113.    It is inappropriate for state governments to try to control or impair federal contracts as a means to achieving their political and policy goals.

114.    Courts have interpreted the Contracts Clause to invalidate a state law that has "operated as a substantial impairment of a contractual relationship," unless that state law "is drawn in an 'appropriate' and 'reasonable' way to advance a 'significant and legitimate public purpose.'" *Sveen v. Melin*, 584 U.S. 811, 819 (2018) (citations omitted).

115.    C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, violate the Contracts Clause because they substantially impair GEO's contractual relationship with ICE and are *not* drawn in an "appropriate" and "reasonable" way to advance a "significant and legitimate public purpose"—they were drawn to apply to AIPC and subject GEO to state-developed and imposed standards and an oppressive

Page 36

inspection and enforcement regime that conflict with congressionally mandated federal detention standards contained in GEO's federal contract with ICE.

116.    It is unreasonable for Colorado to impair the AIPC Contract between the Federal Government and GEO for the housing of federal immigration detainees by novel legislation with an intentionally targeted impact on GEO and ICE. Colorado cannot reasonably assert that the operation of a federal immigration detention facility in the State poses a uniquely troubling emergency justifying interference with GEO's federal contract and federal immigration detention operations.

## PRAYER FOR RELIEF

WHEREFORE, The GEO Group, Inc., respectfully requests that this Court enter an order and judgment:

a.    Declaring that C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, violate the Supremacy Clause and the Contracts Clause of the United States Constitution and are unconstitutional as applied to GEO in its operation of detention facilities for ICE;

b.    Preliminarily and permanently enjoining Defendants, as well as their successors, agents, employees, and all those under their supervision, from enforcing, whether prospectively or retroactively, C.R.S. § 25-1.5-101, as amended by HB 1276 Section 3, and C.R.S. § 25-1-506, as amended by HB 1276 Section 2, against GEO in its operation of detention facilities for ICE;

c.    Awarding attorneys' fees and costs as permitted by law; and

d.    Granting such other and further relief as this Court deems just and proper.

Dated: June 8, 2026.                              Respectfully submitted,


                                                  *s/ Frederick Yarger*
                                                  Frederick R. Yarger
                                                  James N. Boeving
                                                  Wheeler Trigg O'Donnell LLP
                                                  370 Seventeenth Street, Suite 4500
                                                  Denver, CO 80202
                                                  Telephone:   303.244.1800
                                                  Facsimile:    303.244.1879
                                                  Email:   yarger@wtotrial.com
                                                         boeving@wtotrial.com

                                                  Scott Allyn Schipma
                                                  The GEO Group, Inc.
                                                  4955 Technology Way
                                                  Boca Raton, FL 99431
                                                  Telephone:   561.999.7615
                                                  Email:   scott.schipma@geogroup.com

                                                  *Attorneys for Plaintiff*