UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:26-cv-02533

THE GEO GROUP, INC.,

Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado
Department of Public Health & Environment (CDPHE), in her
official capacity;

JEFF LAWRENCE, Director of the Environmental Health and
Sustainability Division of CDPHE, in his official capacity;

PHIL WEISER, Colorado Attorney General, in his official
capacity; and

KELLY WEIDENBACH, Executive Director of the Adams County
Health Department, in her official capacity;

Defendants.

**THE GEO GROUP, INC.'S MOTION
FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

        A.      U.S. Immigration and Customs Enforcement Detention Facilities........................ 2

        B.      Colorado's Sole Operational ICE Facility: Aurora ICE Processing Center ........... 3

        C.      HB 1276 ................................................................................................................ 6

ARGUMENT ..................................................................................................................... 10

I.       GEO is likely to succeed on the merits. ................................................................ 10

        A.      HB 1276 directly regulates federal activities in violation of the
                 intergovernmental immunity doctrine.................................................................... 10

        B.      HB 1276 impermissibly discriminates against the federal government and
                 its contractors in violation of the intergovernmental immunity doctrine. ............ 13

        C.      HB 1276 is preempted because the federal government has occupied the
                 field of immigration detention, a subject dominated by federal interests............. 15

        D.      HB 1276 is preempted because it creates an obstacle to and conflicts with
                 the federal framework for immigration detention.................................................. 18

        E.      HB 1276 is unconstitutional because it violates the Contract Clause................... 21

II.      GEO will suffer irreparable harm absent an injunction. ...................................... 22

III.     The remaining injunction factors favor granting GEO relief............................... 23

IV.    This Court should enter a permanent injunction and final judgment................................ 25

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) .................................................................................................... 17

*Arizona v. California*,
  283 U.S. 423 (1931) .................................................................................................... 11

*Arizona v. United States* ("*Arizona II*"),
  567 U.S. 387 (2012) ............................................................................................. passim

*Arizona v. United States*,
  641 F.3d 339 (2011) .................................................................................................... 25

*Bank One, Utah v. Guttau*,
  190 F.3d 844 (8th Cir. 1999) ...................................................................................... 24

*Banks v. Gonzales*,
  415 F. Supp. 2d 1248 (N.D. Okla. 2006),
  *aff'd,* 490 F.3d 1178 (10th Cir. 2007) ...................................................................... 25

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ................................................................... 11, 12, 13, 18

*Chamber of Com. of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) .............................................................................. 23, 24

*Clark v. Martinez*,
  543 U.S. 371 (2005) ...................................................................................................... 3

*Colorado v. Trump*,
  No. 1:25-CV-03428-RBJ, 2026 WL 734048
  (D. Colo. Mar. 16, 2026) ............................................................................................ 23

*Comm. of Cent. Am. Refugees v. INS*,
  795 F.2d 1434 (9th Cir. 1986) .................................................................................... 16

*CoreCivic, Inc. v. New Jersey*,
  145 F.4th 315 (3d Cir. 2025) ............................................................................... passim

*GEO Group, Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ........................................................................... 1, 12, 13

*Hancock v. Train*,
426 U.S. 167 (1976)............................................................................................. 10, 11

*Hines v. Davidowitz*,
312 U.S. 52 (1941)............................................................................................. 16, 18

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)................................................................................................. 2

*Johnson v. Maryland*,
254 U.S. 51 (1920)................................................................................................. 11

*Kansas ex rel. Kan. Dep't for Children & Families v. SourceAmerica*,
874 F.3d 1226 (10th Cir. 2017) ............................................................................ 23

*Kentucky v. Graham*,
473 U.S. 159 (1985)............................................................................................... 23

*Mayo v. United States*,
319 U.S. 441 (1943)............................................................................................... 11

*McClendon v. City of Albuquerque*,
79 F.3d 1014 (10th Cir. 1996) ............................................................................. 23

*North Dakota v. United States*,
495 U.S. 423 (1990)......................................................................................... 13, 14

*Org. for a Better Austin v. Keefe*,
402 U.S. 415 (1971)............................................................................................... 25

*Osborn v. Bank of the United States*,
22 U.S. 738 (1824)................................................................................................. 11

*Pinson v. Pacheco*,
397 F. App'x 488 (10th Cir. 2010) ....................................................................... 23

*Pub. Utils. Comm'n of Cal. v. United States*,
355 U.S. 534 (1958)............................................................................................... 11

*Railway Mail Ass'n v. Corsi*,
326 U.S. 88 (1945)................................................................................................. 10

*Reyna ex rel. J.F.G. v. Hott*,
921 F.3d 204 (4th Cir. 2019) ................................................................................. 3

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)................................................................................................ 16, 18

*Sveen v. Melin*,
  584 U.S. 811 (2018)...................................................................................................... 22

*The Geo Group, Inc. v. Inslee*,
  151 F.4th 1107 (9th Cir. 2025) .................................................................................... 12

*The Geo Group, Inc. v. Inslee,*
  166 F.4th 1188 (9th Cir. 2026) .............................................................................. 12, 14

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ..................................................................................... 3, 19

*United States v. Washington*,
  596 U.S. 832 (2022)......................................................................................... 13, 14, 15

*Utah Licensed Beverage Ass'n v. Leavitt*,
  256 F.3d 1061 (10th Cir. 2001) ................................................................................... 24

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ..................................................................................... 25

*Van Rinh v. Reno*,
  197 F.3d 427 (10th Cir. 1999) ..................................................................................... 16

*Washington v. United States*,
  460 U.S. 536 (1983)...................................................................................................... 14

**STATUTES**

18 U.S.C. § 4013................................................................................................... 2, 3, 16

28 U.S.C. § 530C ................................................................................................. 2, 3, 17

6 U.S.C. § 112....................................................................................................... 2, 3, 16

6 U.S.C. § 202.............................................................................................................. 2

6 U.S.C. § 205................................................................................................... 8, 17, 19

6 U.S.C. § 251.............................................................................................................. 2

6 U.S.C. § 551.............................................................................................................. 2

6 U.S.C. § 557 ............................................................................................................. 2

8 U.S.C. § 1103 ........................................................................................................... 2

8 U.S.C. § 1231 ......................................................................................... 2, 3, 16, 20

C.R.S. § 25-1.5-1.1 .................................................................................................... 10

C.R.S. § 25-1.5-101 .............................................................................................. passim

C.R.S. § 25-1-506 ....................................................................................................... 7

**RULES**

Pub. L. No. 106-553, § 119, 114 Stat. 2762A-69 ........................................................ 3

**OTHER AUTHORITIES**

163 Cong. Rec. 76, H3812 (2017) ...................................................................... 17, 20

H.R. Rep. No. 114-668 (2016).............................................................................. 5, 17

Homeland Security Act of 2002,
   Pub. L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002) ............................................. 2

Leg. Council Staff, *Fiscal Note for HB 26-1276* (May 5, 2026) ......................... 1, 7, 14

*Name Change From the Bureau of Immigration and Customs
   Enforcement to U.S. Immigration and Customs Enforcement*,
   72 Fed. Reg. 20 (April 23, 2007)............................................................................... 2

U.S. Const. art. VI, cl. 2. In *McCulloch v. Maryland*, 17 U.S. 316 (1819) ................... 10

U.S. Dep't of Justice, Exec. Office for Immigr. Review,
   *Aurora Immigration Court* (last visited June 8, 2026) ............................................. 4

U.S. Immigr. & Customs Enf't, *Facility Inspections* (last visited June 8, 2026) .................... 8, 17

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XI ................................................................................................ 23

**INTRODUCTION**

On June 3, 2026, Governor Jared Polis signed Colorado House Bill 26-1276 ("HB 1276") into law. HB 1276 was enacted expressly to empower state and local officials to directly regulate facilities used by the United States government to securely detain noncitizens who are subject to removal from the country. This includes facilities "operated on behalf of or pursuant to a contract with federal immigration authorities." HB 1276 at 3. As the legislative history of HB 1276 makes clear, there is only "one existing detention center in the state"[1] that is subject to HB 1276: the Aurora ICE Processing Center ("AIPC"). This facility provides federal immigration detention and processing services pursuant to a contract between Plaintiff The GEO Group, Inc. ("GEO") and United States Immigration and Customs Enforcement.

HB 26-1276 fits into a broader pattern of state efforts to improperly assert regulatory authority over immigration detention facilities based on state and local elected officials' political objections to federal immigration policy. For example, California attempted to functionally ban private detention contracts—an effort incompatible with principles of intergovernmental immunity and federal preemption. *GEO Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc). A similar New Jersey law was struck down by the Third Circuit because it impermissibly "interfere[d] with the federal government's core power to enforce immigration laws." *CoreCivic, Inc. v. New Jersey*, 145 F.4th 315, 319 (3d Cir. 2025).

HB 1276, the most recent attempt by a state to directly regulate the federal government's immigration detention operations, is a direct affront to the Supremacy Clause of the United

---

[1] Leg. Council Staff, *Fiscal Note for HB 26-1276* at 4 (May 5, 2026), https://leg.colorado.gov/bill_files/115839/download

States Constitution. This Court should declare HB 1276 unconstitutional and enter a preliminary and permanent injunction restraining Defendants from enforcing it against GEO.

## BACKGROUND

### A.    U.S. Immigration and Customs Enforcement Detention Facilities

In 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service ("INS") to the newly created Bureau of Immigration and Customs Enforcement ("ICE"), housed within the Department of Homeland Security.[2] The Bureau began operations in March 2003 and was renamed ICE in March 2007.[3]

Congress authorizes or requires the detention of noncitizens under a number of different statutes. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 285–89 (2018). To carry out these detention obligations, Congress directed that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4); 18 U.S.C. § 4013, note, "Contracts for Space or Facilities."[4]

---

[2] *See* Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002).

[3] *Name Change From the Bureau of Immigration and Customs Enforcement to U.S. Immigration and Customs Enforcement*, 72 Fed. Reg. 20,131 (April 23, 2007).

[4] Although 8 U.S.C. § 1231(g)(1), 28 U.S.C. § 530C(a)(4), and the note accompanying 18 U.S.C. § 4013 all mention the "Attorney General," the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the immigration-enforcement functions and programs of INS to the Secretary of Homeland Security, *see* 6 U.S.C. § 202(3); *id*. § 251(2); 8 U.S.C. § 1103(a)(1); provided that the Secretary "shall have all functions relating to the [INS] that any other official could by law exercise in relation to the agency immediately before such transfer," 6 U.S.C. § 551(d)(2); and specified that for those transferred functions "reference in any other Federal law to any … officer … the functions of which are so transferred shall be deemed to refer to the Secretary," 6 U.S.C. § 557. Therefore, to the extent the provisions cited above relate to immigration detention and removal, their references to the "Attorney General" now refer to

Critical to this case, Congress also expressly authorized ICE to use private detention contractors. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019). As a general matter, Congress granted the Secretary of Homeland Security broad authority "to make contracts … as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties. Congress also granted the Secretary authority to "carr[y] out," "in [his] reasonable discretion," the activities of ICE "through any means, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," except to the extent such agreements are otherwise precluded by federal law. 28 U.S.C. § 530C(a)(4). Congress further directed that "[t]he [Secretary] shall arrange for *appropriate places of detention for aliens detained pending removal or a decision on removal*," 8 U.S.C. § 1231(g)(1) (emphasis added), and in 2000, Congress enacted a statute empowering the Secretary to carry out this obligation through his contracting authority: "Notwithstanding any other provision of law, . . . the [Secretary] hereafter may *enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis*." 18 U.S.C. § 4013 note "Contracts for Space or Facilities" (emphasis added) (quoting Pub. L. No. 106-553, § 119, 114 Stat. 2762A-69).

### B.    Colorado's Sole Operational ICE Facility: Aurora ICE Processing Center

There is currently only one operational federal ICE detention facility in Colorado: the

---

the Secretary. *See, e.g.*, *Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019) (explaining that the mention of the "Attorney General" in 8 U.S.C. § 1231(g)(1) refers to the Secretary); *cf. Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

AIPC at 3130 North Oakland Street in Aurora, with a capacity of 1,360 beds. Ex. A at 31.[5] AIPC is operated by GEO under a contract with ICE that has a five-year performance period running from October 16, 2021, through October 15, 2026. *Id*. at 3. AIPC includes dedicated facilities occupied by ICE. *Id*. at 34–36 (setting forth requirements for "ICE Administrative Space"). It also houses the Aurora Immigration Court, which falls under the jurisdiction of the Office of the Chief Immigration Judge, a component of the Executive Office for Immigration Review within the United States Department of Justice. *Id*. at 34 (requiring courtrooms, offices, and other facilities for the "Executive Office of Immigration Review").[6]

The current ICE contract for AIPC ("AIPC Contract") includes numerous detailed requirements that mandate strict adherence to hundreds of federal regulations and standards. *E.g.*, *Id*. at 32–33. ICE mandates, among other things, that all of its contractors providing detention services (state and private) operate in conformance with the Performance Based National Detention Standards ("PBNDS"). *See id*. The PBNDS is a comprehensive, detailed 455-page document that imposes extensive requirements on immigration detention facilities and their operation. Contractors—including GEO—must implement all standards in the PBNDS, and they are regularly audited to ensure compliance. *Id*.

The current PBNDS were implemented at the direction of Congress: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 Prison Based National Detention Standards (PBNDS) … including a list of facilities that are not

---

[5] Ex. A is the AIPC Contract. *See* Decl. of Daniel Ragsdale. Citations to Ex. A are to the PDF pages of the document.

[6] *See also* U.S. Dep't of Justice, Exec. Office for Immigr. Review, *Aurora Immigration Court* (last visited June 8, 2026), https://www.justice.gov/eoir/aurora-immigration-court.

4

yet in compliance; [and] a schedule for bringing facilities into compliance. … The Committee expects ICE to refrain from entering into new contracts or IGSAs that do not require adherence to … 2011 PBNDS standards." H.R. Rep. No. 114-668, at 35 (2016). The "Preface" to the PBNDS provides, among other things:

> *Detention is an important and necessary part of immigration enforcement.* Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care.

> \* \* \*

> The PBNDS 2011 reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose.

U.S. Immigr. & Customs Enf't, 2011 PBNDS (rev. Dec. 2016) ("2011 PBNDS") (emphasis added), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

The PBNDS applicable to AIPC are over 455 pages long, and they set forth detailed standards governing a range of subjects, including food safety and quality; access to safe, potable water; medical care; environmental health and safety; sanitation and cleanliness; and standards of care for housing, security, and other operations. As just one example, Section 4.1 sets forth extensive standards governing food service, availability, and quality. Among those requirements are the following:

> All detainees shall be provided nutritionally balanced diets that are reviewed at least quarterly by food service personnel and at least annually by a qualified nutritionist or dietitian.

> \* \* \*

> Detainees, staff and others shall be protected from injury and illness by adequate food service training and the application of sound safety and sanitation practices in all aspects of food service and dining room operations.

> \* \* \*

5

Every open food item and beverage shall be protected from contaminants by easily cleaned sneeze-guards, cabinets, display cases or other such equipment.

* * *

Servers must wear food-grade plastic gloves and hair nets whenever there is direct contact with a food or beverage. Servers must use tongs, forks, spoons, ladles or other such utensils to serve any food or beverage. Serving food without use of utensils is strictly prohibited.

* * *

A registered dietitian shall conduct a complete nutritional analysis that meets U.S. Recommended Daily Allowances (RDA), at least yearly, of every master-cycle menu planned by the FSA. The dietitian must certify menus before they are incorporated into the food service program.

* * *

Food and ice shall be protected from dust, insects and rodents, unclean utensils and work surfaces, unnecessary handling, coughs and sneezes, flooding, drainage, overhead leakage and other sources of contamination. Protection shall be continuous, whether the food is in storage, in preparation, on display or in transit.

* * *

All food service personnel shall wear clean garments, maintain a high level of personal cleanliness and practice good hygiene at all times.

*Id*. at 228–51.[7]

## C.    HB 1276

On February 19, 2026, HB 1276 was introduced in the Colorado General Assembly. On June 3, 2026, it was signed by the President of the Colorado Senate and the Speaker of the Colorado House. The next day, June 4, Governor Polis signed the bill into law, making it effective immediately.

---

[7] This is just one example from the PBNDS. The entirety of that 455-page document imposes detailed requirements on every conceivable aspect of the operation of immigration detention facilities.

HB 1276 grants new enforcement authority to the Colorado Attorney General and new regulatory powers to the Colorado Department of Public Health and Environment ("CDPHE") and local officials. The fiscal note for HB 1276, prepared by Colorado's Legislative Council Staff, acknowledges that there is only "one existing detention center in the state" that would be subject to HB 1276—namely, AIPC.[8] Each provision of HB 1276 that applies to AIPC is an attempt to either duplicate or supersede requirements imposed by the AIPC Contract and federal law. Those provisions fall into two general categories.

**First**, HB 1276 grants CDPHE new authority under Colo. Rev. Stat. § 25-1.5-101(1)(i)(I)(D) to conduct "unannounced inspections and examinations" of "a facility that houses or detains individuals who are noncitizens for purposes of civil immigration proceedings."[9] These CDPHE inspections "must be made at least one time every three months, and may be made more frequently." HB 1276 mandates that GEO itself—not the state—must "pay for the inspections and examinations," and it requires GEO to "provide" to state and local officials "all access necessary to perform … inspection[s] or investigation[s], including access to people who are detained, records, facility officials, and facility personnel." If GEO does not grant access for these "inspections and examinations," HB 1276 imposes "a civil penalty of not more than fifty thousand dollars for each refusal."

Under the AIPC Contract, however, it is the federal government that retains the right to

---

[8] Leg. Council Staff, *Fiscal Note for HB 26-1276* at 4 (May 5, 2026), https://leg.colorado.gov/bill_files/115839/download

[9] Section 2 of HB 1276, meanwhile, grants county or district health agencies power "to inspect or examine a facility that houses or detains individuals who are noncitizens for purposes of civil immigration proceedings" under Colo. Rev. Stat. § 25-1-506(3)(b)(XVI).

conduct "periodic and unscheduled audits and inspections" of AIPC and ensure compliance with all contractual and other requirements. *E.g.*, Ex. A at 33, 45.[10] This federal oversight is mandated not only by the contract, but by statute. 6 U.S.C. § 205 (establishing "Immigration Detention Ombudsman" responsible for "civil detention care and custody" in the immigration system, and granting that official "unfettered access" to detention facilities for "unannounced inspections").[11] Moreover, GEO does not control access to AIPC or records related to its operation—the United States government does. Ex. A at 44, 88, 94 (stating that records "related to the operation of the facility" are "property of the U.S. Government" and imposing access restrictions on records and information); *id.* at 90 ("The Contractor shall comply with all the PBNDS 2011 (REV. 2016) pertaining to the security and control of the detention facilities."); *see also* 2011 PBNDS at 383 (requiring ICE approval for law enforcement officials requesting visits with detainees); *id.* at 428 (requiring "prior approval" of the ICE "Field Office Director" for visits by any stakeholder, including intergovernmental entities).

CDPHE's new "inspection" and "investigation" authority covers a range of subject matter areas: "food safety standards"; "drinking water quality"; "confinement conditions"; and "standards of care provided to individuals who are detained." All of these subjects are

---

[10] The AIPC Contract also imposes extensive requirements to enable federal officials to ensure compliance with "quality standards in operating and maintaining detention facilities" that "address all facets of detainee handling, including safety, health, legal rights, [and] facility and record management." Ex. A at 127–30. ICE has numerous mechanisms to ensure compliance, including a program of regular inspections. *Id*. Failure to comply can result in the United States withholding payment under the AIPC Contract or terminating it entirely. *Id*. at 46, 130.

[11] *See also* U.S. Immigr. & Customs Enf't, *Facility Inspections* (last visited June 8, 2026) https://www.ice.gov/detain/facility-inspections (describing a "robust and multilevel oversight and compliance program for all detention facilities).

8

extensively addressed in both the AIPC Contract and the PBNDS. *E.g.*, Ex. A at 32 (mandating compliance with PBNDS and requiring obtaining and maintaining various accreditations); 47–50 (governing staffing and personnel requirements); 64–73 (governing health and medical care policies, including screening for infectious disease and health assessments); *see generally* 2011 PBNDS.

**Second**, HB 1276 attempts to impose direct, state-level regulatory mandates on immigration detention facilities through Colo. Rev. Stat. § 25-1.5-101(1)(dd). This provision requires—and grants CDPHE rulemaking authority over—various aspects of facility operations:

- Mandatory reporting by the facility to CDPHE on a variety of subjects, including health (*e.g.*, "outcomes of pregnant individuals" and those with "health conditions"); "access to food for individuals with dietary restrictions"; environmental and facility safety (*e.g.*, "average temperature within the facility"); and detainee access to attorneys.

- Restrictions on the housing of minors.

- Mandated medical staffing at the facility and the qualifications of medical staff.

All of these subjects are, again, covered in detail by both the AIPC Contract and the PBNDS. *E.g.*, Ex. A at 32, 47–50, 64–73; *see generally* 2011 PBNDS. For example, the AIPC Contract sets out detailed facility staffing and qualification requirements—and those requirements cannot be changed without ICE approval. Ex. A at 47. Failure to comply with HB 1276's state-imposed mandates results in severe penalties of "not more than fifty thousand dollars for each violation."

Tellingly, the text of HB 1276 acknowledges that the State of Colorado has no power to directly regulate the federal government. HB 1276 applies to "a local, county, or private facility … including a facility that is operated on behalf of or pursuant to a contract with federal immigration authorities"—but it expressly "does not apply to detention facilities operated directly by the federal government." Colo. Rev. Stat. § 25-1.5-1.1(1)(i)(I)(D), (1)(dd). Its

9

provisions thus falsely assume that Colorado can regulate the operations of the federal government when the United States determines, under its expressly granted statutory authority, to carry out its immigration functions through contracts with entities such as GEO. As explained below, that is incorrect as a matter of law.

**ARGUMENT**

**I.      GEO is likely to succeed on the merits.**

**A.      HB 1276 directly regulates federal activities in violation of the intergovernmental immunity doctrine.**

The Supremacy Clause provides that the "Laws of the United States" are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. In *McCulloch v. Maryland*, 17 U.S. 316 (1819), the Supreme Court recognized that the guarantee of federal supremacy would be meaningless if the federal government were not immune from state regulation. Under this core principle, a state law directly regulates the federal government—and is therefore unconstitutional—if it "involve[s] a direct, physical interference with federal activities … or some direct, immediate burden on the performance of [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). Applying this rule, the Supreme Court has repeatedly invalidated neutral, generally applicable state laws that substantially burden federal activity. *E.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976); *Mayo v. United States*, 319 U.S. 441, 447–48 (1943); *Arizona v. California*, 283 U.S. 423, 451 (1931); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920).

In assessing whether a state law substantially burdens federal operations, there is no distinction between state regulation of federal employees and state regulation of private contractors carrying out federal operations. *Osborn v. Bank of the United States*, 22 U.S. 738, 867 (1824) (rejecting state power "to control [a federal contractor's] operations"). Courts have

10

consistently affirmed this rule. *See, e.g.*, *Hancock*, 426 U.S. at 180–81 (state environmental permitting scheme invalid as applied to contractor operating federal facility); *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 543-45 (1958) (common-carrier rate regulation invalid as applied to federal contractors). Intergovernmental immunity "is not a formalist doctrine." *CoreCivic*, 145 F.4th at 322. Courts must "look through form and behind labels to substance" and probe the "purpose or self-evident operation of a statute" to determine whether it is being used to evade the limits on intergovernmental immunity "by indirectly achieving the same result." *Id.* (citation omitted). Indeed, "what cannot be done directly cannot be done indirectly." *Id.* (citation omitted).

Following these precedents, the Ninth Circuit has held that intergovernmental immunity bars a state from substantially interfering with federal activities performed by a private contractor, even on private land. In *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), California imposed environmental-remediation standards on a contaminated site. Although Boeing owned most of the property, the federal government had assumed remediation responsibility and contracted with Boeing to perform the work under federal direction. *Id.* at 835–36, 839. The court held that the state statute impermissibly regulated federal activities, even though it applied to Boeing as a private contractor on privately owned land. The law "directly interfere[d] with the functions of the federal government" by dictating how Boeing performed services "the federal government hired Boeing to perform," replacing federal cleanup standards with state standards, and regulating the effective terms of the federal contract itself. *Id*. at 840.

The Ninth Circuit applied these principles in *GEO Group*, holding that California's attempt to ban private detention facilities violated the intergovernmental immunity doctrine. The

11

court recognized that "neutral state laws imposed on the private conduct of federal contractors violate[ ] the Supremacy Clause." 50 F.4th at 760. As the court observed, states cannot "interfere[ ] with federal functions by overriding federal contracting decisions" and thus cannot attempt to interfere with the federal government when it "exercis[es] its discretion to arrange for immigration detention in … privately run facilities it has deemed appropriate." *Id*. at 761.[12] Most recently, in *CoreCivic*, the Third Circuit struck down a New Jersey law that likewise targeted immigration detention facilities operated by private contractors. Although the law's text did not apply to the federal government, the court determined that it was "a direct regulation [of the federal government] in everything but name." 145 F.4th at 326.

HB 1276 presents the same constitutional defect. Like the laws invalidated in *GEO Group* and *CoreCivic*, HB 1276 seeks to regulate the federal government's immigration detention operations through indirect means. Tellingly, HB 1276 itself acknowledges that Colorado lacks authority to impose these requirements on "detention facilities operated directly by the federal government." Colo. Rev. Stat. § 25-1.5-101(1)(i)(I)(D), (1)(dd). That is dispositive. Under long-established intergovernmental immunity principles, Colorado cannot accomplish through regulation of a federal contractor what it concedes it could not do directly.

---

[12] The Ninth Circuit later overturned a district court order enjoining a subsequent iteration of a state's attempt to directly regulate private detention facilities. *The Geo Group, Inc. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025). But it did so over the dissent of eight other judges, who would have granted en banc review and upheld the district court's injunction. 166 F.4th 1188 (9th Cir. 2026). The panel, the dissenters explained, "ignored the Supremacy Clause" and disregarded the fact that the state law was "merely the latest round in [the state's] crusade against the federal government's use of federal contractors to enforce immigration policy." *Id*. at 1191 (Bumatay, J., et al., dissenting). As those judges observed, "the power to burden is the power to destroy," and the state's attempt to directly regulate contractors who provide detention services was "an open-and-shut case of intergovernmental immunity." *Id*. at 1192–93.

*E.g.*, *CoreCivic*, 145 F.4th at 326.

By requiring state inspections of AIPC, demanding access to detainees and facility records that remain under federal control, imposing mandatory reporting to CDPHE on matters already governed by the PBNDS, dictating medical staffing requirements, and threatening $50,000 penalties for each instance of noncompliance, HB 1276 "mandat[es] the ways in which [GEO] renders services that the federal government hired [GEO] to perform" and "replaces the federal [detention] standards that [GEO] has to meet to discharge its contractual obligations to [the Federal Government] with the standards chosen by the state." *Boeing*, 768 F.3d at 840. Because HB 1276 "regulates not only the federal contractor but the effective terms of federal contract itself," *id.*, it directly regulates federal activities in violation of the intergovernmental immunity doctrine and is unconstitutional as applied to GEO.

**B.    HB 1276 impermissibly discriminates against the federal government and its contractors in violation of the intergovernmental immunity doctrine.**

The doctrine of intergovernmental immunity prohibits state laws that either "regulate the United States directly or discriminate against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (cleaned up) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). A state law impermissibly discriminates against the federal government or its contractors if it "single[s them] out" for less-favorable "treatment," *Washington v. United States*, 460 U.S. 536, 546 (1983), or if it regulates them unfavorably on some basis related to their governmental "status," *North Dakota*, 495 U.S. at 438 (plurality opinion). Preventing discrimination against the federal government or those with whom it contracts "lies at the heart" of the intergovernmental immunity doctrine. *United States v. Washington*, 596 U.S. at 841. The federal government is "the

only entity in the business, so to speak, of buying private immigration detention." *CoreCivic*, 145 F.4th at 325 (citation omitted). Colorado cannot single out immigration detention contractors—let alone GEO, the only entity with an operational contract in the state—for unique regulatory burdens.

HB 1276 targets a single facility—AIPC—operated by a federal contractor on behalf of ICE. As detailed in Colorado's own fiscal note, there is only "one existing detention center in the state" that is subject to HB 1276. Leg. Council Staff, *Fiscal Note for HB 26-1276* at 4 (May 5, 2026). Every provision of HB 1276 applies exclusively to facilities that "hous[e] or detain individuals who are noncitizens for purposes of civil immigration proceedings," Colo. Rev. Stat. § 25-1.5-101(1)(i)(I)(D)—a statutory definition that, in terms of federally contracted private detention centers, describes AIPC and no other facility in Colorado.[13] The law thus singles out the sole facility in the state that performs federal immigration detention functions for a comprehensive regime of state inspections, investigations, reporting requirements, staffing mandates, and civil penalties that apply to no similarly situated Colorado facility.

Colorado's discrimination against GEO (and, ultimately, the federal government) is evident from the face of HB 1276. The law imposes quarterly unannounced inspections—at GEO's expense—on facilities contracting with federal immigration authorities. HB 1276 mandates reporting to CDPHE on health outcomes, food access, facility temperatures, and

---

[13] HB 1276 does not apply to any state facilities at all—it applies only to facilities "operated on behalf of or pursuant to a contract with federal immigration authorities" or "local" or "county" facilities. Colo. Rev. Stat. § 25-1.5-101(1)(i)(I)(D). Thus, HB 1276 burdens federal operations while exempting the state, making this an "easy" case. *Inslee*, 166 F.4th at 1193 (Bumatay, J., et al., dissenting).

attorney access, none of which apply to other detention facilities. And HB 1276 threatens civil penalties of up to $50,000 per violation for noncompliance, penalties that apply only to facilities used to carry out the federal government's immigration enforcement actions. Colorado thus subjects the federal government and its contractor to burdens and liabilities that the state does not impose on itself or private entities performing similar functions for the state.

HB 1276's discriminatory design is underscored by the statute's own acknowledgment that Colorado cannot directly regulate federal detention operations. The law expressly "does not apply to detention facilities operated directly by the federal government." Colo. Rev. Stat. § 25-1.5-101(1)(i)(I)(D), (1)(dd). That carve-out confirms Colorado's recognition that imposing these requirements on federal operations would be unconstitutional. Yet intergovernmental immunity "lies at the heart" of the Supremacy Clause precisely because states cannot circumvent the Constitution by regulating the "Federal Government or those with whom it deals" more onerously than they regulate similarly situated state actors. *United States v. Washington*, 596 U.S. at 839, 841 (citation omitted). By exempting federal facilities while targeting federal contractors, Colorado has done exactly that.

C.     **HB 1276 is preempted because the federal government has occupied the field of immigration detention, a subject dominated by federal interests.**

State law is preempted when it operates in a field "of federal regulation … so pervasive … that Congress left no room for the States to supplement it" or "in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Arizona v. United States* ("*Arizona II*"), 567 U.S. 387, 399 (2012). Immigration is an area in which federal interests often dominate. *Arizona II*, 567 U.S. at 395 ("[F]oreign countries concerned about the status, safety,

15

and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."); *Hines v. Davidowitz*, 312 U.S. 52, 64–67 (1941) (explaining that immigration is a field that "demand[s] broad national authority").

Federal law vests exclusive authority over immigration detention in the Secretary of Homeland Security. Congress has directed that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). In enacting Section 1231(g)(1), "Congress ... placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986); *see also Van Rinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999). To carry out this mandate, Congress granted the Secretary authority "to make contracts ... as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), and authorized the Secretary to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013, note, "Contracts for Space or Facilities." Congress further authorized ICE to carry out its functions "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4). This comprehensive statutory framework reflects Congress's determination that the federal government alone should decide how, where, and by whom immigration detention is carried out.

Congress has also established a comprehensive regulatory regime governing every aspect of immigration detention operations. The PBNDS—which Congress directed ICE to

16

implement—span over 450 pages and prescribe detailed standards governing detainee safety, security, care, health, welfare, activities, and administration. *See* 163 Cong. Rec. 76, H3812 (2017); H.R. Rep. No. 114-668, at 35. In 2019, Congress further extended federal oversight by creating the Office of the Immigration Detention Ombudsman ("OIDO") to inspect, investigate, and resolve complaints regarding compliance with the health and safety standards imposed by the PBNDS. 6 U.S.C. § 205.[14] The PBNDS cover every subject that HB 1276 purports to regulate: food and nutritional services, medical care and staffing, environmental health and safety, facility inspections, access to legal services, and confinement conditions. The comprehensive framework enacted by Congress regarding the detention and care of aliens pending removal leads to the conclusion that the Federal Government has occupied the field. *See Arizona II*, 567 U.S. at 401; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003). It cannot be that "all fifty states could pass laws" imposing differing standards on immigration detention facilities. *CoreCivic*, 145 F.4th at 328. Federal uniformity would be impossible, despite the overriding need for a uniform national system.

Where Congress has occupied an entire field, "complementary state regulation is impermissible"—even if that regulation "is parallel to federal standards." *Arizona II*, 567 U.S. at 401. But the dominant interest doctrine goes further still: where federal interests are paramount, state regulation is preempted even absent a comprehensive regulatory scheme. Immigration detention satisfies both standards. The conditions of confinement for immigration detainees are

---

[14] *See also* U.S. Immigr. & Customs Enf't, *Facility Inspections* (last visited June 8, 2026), https://www.ice.gov/detain/facility-inspections (describing a "robust and multilevel oversight and compliance program for all detention facilities").

the quintessential "field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230. Concern for orderly immigration and for the reciprocal treatment of United States citizens detained abroad "make the treatment of aliens, in whatever state they may be located, a matter of national moment." *Hines*, 312 U.S. at 73.

HB 1276 intrudes upon this federal domain. By imposing state inspection regimes, reporting directives, operational requirements, staffing directives, and civil penalties on the sole private immigration detention facility in Colorado, HB 1276 attempts to supplant federal detention standards with standards "chosen by the state." *Boeing*, 768 F.3d at 840. HB 1276 substitutes CDPHE's judgment on matters Congress has reserved for itself—from facility inspections and staffing qualifications to environmental standards and detainee access to counsel. Because Congress has occupied the field of immigration detention, and because the federal interest in this field is dominant, HB 1276 is preempted as applied to GEO's operations at AIPC on behalf of ICE.

### D. HB 1276 is preempted because it creates an obstacle to and conflicts with the federal framework for immigration detention.

Under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law." *United States v. California*, 921 F.3d at 878 (quoting *Arizona II*, 567 U.S. at 399). This includes cases where "compliance with both federal and state regulations is a physical impossibility" and where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 879 (quoting *Arizona II*, 567 U.S. at 399).

The requirements set forth in HB 1276 directly conflict and create undeniable

18

inconsistencies with those contained in the AIPC Contract and PBNDS. HB 1276 grants CDPHE new authority to conduct "unannounced inspections and examinations" of AIPC "at least one time every three months," at GEO's expense, and imposes civil penalties of up to $50,000 "for each refusal" to provide access. Colo. Rev. Stat. § 25-1.5-101(1)(i)(I)(D). But the AIPC Contract reserves to the federal government—not Colorado—the right to conduct "periodic and unscheduled audits and inspections" of AIPC and ensure compliance with contractual requirements. Ex. A at 33, 45. And federal law creates the "Immigration Detention Ombudsman," who has "unfettered access" to detention facilities for "unannounced inspections." 6 U.S.C. § 205. GEO cannot grant Colorado the access HB 1276 demands because the United States, not GEO, controls access to AIPC and its records. Ex. A at 44, 88, 94.

Similarly, HB 1276 mandates that GEO report to CDPHE on "outcomes of pregnant individuals" and those with "health conditions," "access to food for individuals with dietary restrictions," "average temperature within the facility," and detainee "access to attorneys." Colo. Rev. Stat. § 25-1.5-101(1)(dd). These state reporting mandates directly conflict with the federal reporting regime already in place. The AIPC Contract requires GEO to report to ICE—not state agencies—on these and other operational matters. *E.g.*, Ex. A at 75, 87, 90. And the PBNDS prescribe detailed standards governing food services, medical care, environmental health, and access to medical and legal services—all of which are subject to federal, not state, oversight. *See generally* 2011 PBNDS.

HB 1276 also imposes "[m]andated medical staffing at the facility and the qualifications of medical staff." Colo. Rev. Stat. § 25-1.5-101(1)(dd). But the AIPC Contract and PBNDS already prescribe GEO's staffing obligations, and only ICE may approve changes. Ex. A at 47–

50 (governing staffing and personnel requirements); 2011 PBNDS at 257–326 (setting forth detailed medical care standards, including staffing requirements).

While additional examples of conflicts and inconsistencies between the requirements of HB 1276 and the PBNDS could be provided, the foregoing demonstrates that compliance with both HB 1276 and the applicable federal requirements is an impossibility. As a result, HB 1276 is preempted because it directly conflicts with the federal framework for immigration detention.

Similarly, HB 1276 stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Congress has granted the Secretary of Homeland Security and ICE broad authority to arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. 8 U.S.C. § 1231(g)(1). The "Preface" to the PBNDS reflects this Congressional grant of broad authority to ICE and explains that the PBNDS reflect ICE's ongoing effort to tailor the conditions of immigration detention to its unique purpose. 2011 PBNDS at i. The current PBNDS were implemented and included in the AIPC Contract at the explicit direction of Congress. 163 Cong. Rec. 76, H3812 (2017). Accordingly, Congress has granted ICE broad authority to arrange for alien detention pending removal and expressed the objective of establishing a uniform framework and set of tailored standards and requirements applicable to federal immigration detention—as detailed in the PBNDS. HB 1276 would supplant those uniform federal standards and substitute standards based on the judgment of the Colorado General Assembly and CDPHE. Allowing 50 state legislatures and an untold number of state agencies to dictate their own preferred requirements, standards, and corresponding inspection and enforcement regimes applicable to alien detention would result in a state-by-state patchwork of requirements that creates an obstacle to the Congressional objective of

implementing a uniform set of requirements tailored to the unique purposes of federal alien detention. *Cf. CoreCivic*, 145 F.4th at 328 (explaining that a patchwork of state regulations governing immigration detention facilities would create "disruptive state collision").

**E.      HB 1276 is unconstitutional because it violates the Contract Clause.**

Article 1, Section 10 of the U.S. Constitution provides that "[n]o State shall … pass any … Law impairing the Obligation of Contracts." To determine whether a law affecting pre-existing contracts violates the Contracts Clause, courts apply a "two-step test," first asking "whether the state law has operated as a substantial impairment of a contractual relationship" based on "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights," and "if such factors show a substantial impairment," the court then determines "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen v. Melin*, 584 U.S. 811, 819 (2018) (cleaned up).[15]

HB 1276 substantially impairs GEO's contractual relationship with ICE. The AIPC Contract contains numerous detailed requirements that mandate strict adherence to federal regulations and standards—including the PBNDS. Ex. A at 32–33. GEO reasonably expected that its contractual obligations would be governed by federal law, not by a patchwork of conflicting state requirements. HB 1276 upends that bargain. Compliance with HB 1276 would require GEO to breach multiple explicit contractual requirements—including provisions governing facility access, records, staffing, and inspections—that could lead to a complete

---

[15] GEO reserves the right to challenge this interpretation of the Contracts Clause on appeal. *See Sveen*, 584 U.S. at 827–30 (Gorsuch, J., dissenting).

termination of GEO's contract. *See* Ex. A at 46, 130. Moreover, even if compliance with both HB 1276 and GEO's contract were possible, HB 1276's quarterly inspection regime (at GEO's expense), new reporting mandates, medical staffing requirements, and potential $50,000-per-violation civil penalties would significantly increase the costs associated with the performance of GEO's current contract, defeating the expectations of the parties and dramatically altering the financial bargain. As a result, HB 1276 is unconstitutional because it violates the Contracts Clause.

## II.    GEO will suffer irreparable harm absent an injunction.

GEO has shown a substantial likelihood that HB 1276 violates the U.S. Constitution. It follows that the harm HB 1276 would inflict on GEO during the pendency of litigation—forcing GEO to breach its contract with ICE, risking contract termination, and forcing GEO to implement burdensome operational changes at AIPC—is irreparable. *Pinson v. Pacheco*, 397 F. App'x 488, 492 (10th Cir. 2010) ("[A] constitutional injury is irreparable in the sense that it cannot be adequately redressed by post-trial relief."). Moreover, a legal requirement that would "interfere with law enforcement initiatives" causes irreparable harm, *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1024 (10th Cir. 1996), and HB 1276 directly interferes with GEO's role as a federal contractor with responsibility to participate in the enforcement of the United States immigration laws.

Even if this Court does not determine that GEO faces irreparable harm from HB 1276's conflict with the Constitution and interference with law enforcement functions that GEO is required to carry out, GEO's harm is irreparable under the standard for non-constitutional injuries. GEO has no adequate legal remedy for an obvious reason: it may not pursue a damages

22

suit in federal court against Colorado for the financial harm it will suffer if HB 1276 takes effect. *See* U.S. Const. amend. XI; *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010); *Kansas ex rel. Kan. Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017) ("A party suing the government suffers irreparable harm where monetary relief might not be available because of the government's sovereign immunity." (cleaned up)); *Colorado v. Trump*, No. 1:25-CV-03428-RBJ, 2026 WL 734048, at *19 (D. Colo. Mar. 16, 2026) (finding irreparable harm when "financial losses" could not be recovered "because the federal government is shielded by sovereign immunity").

"If forced to comply with [HB 1276, GEO] will face a significant risk of suffering financial harm …." *Edmondson*, 594 F.3d at 770–71. HB 1276 imposes various requirements that GEO cannot comply with—among them, staffing changes and access requirements that fall under the sole authority of ICE. "Yet, because [Colorado] and its officers are immune from suit for retrospective relief, these … injuries cannot be remedied." *Id.* "Should [GEO] decline to comply with the Act, [it will] face investigation and other consequences" as well as "liability" for harsh financial penalties of up to $50,000 per violation. *Id.* "These consequences, in and of themselves, demonstrate a likelihood of irreparable harm." *Id.*

## III.  The remaining injunction factors favor granting GEO relief.

The balance of equities likewise supports injunctive relief. Colorado "does not have an interest in enforcing a law that is likely constitutionally infirm." *Edmondson*, 594 F.3d at 771. That is true "even assuming" HB 1276 serves purposes consistent with federal immigration

23

law—which it most decidedly does not. *Id.* The "conflicting means" of HB 1276 interferes with federal immigration enforcement. *Id.* And the public interest favors enjoining a state law that is likely unconstitutional. *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999) (explaining that, when a law is preempted, there is no harm to the state from enjoining its enforcement, and "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law").[16]

The public interest strongly favors injunctive relief. The federal government has a paramount interest in uniform enforcement of the nation's immigration laws. *Arizona II*, 567 U.S. at 399. Congress has granted ICE exclusive authority to arrange for appropriate places of detention for noncitizens awaiting removal, and has mandated uniform national detention standards through the PBNDS. The public interest is served by preserving federal supremacy and ensuring that ICE can carry out its detention functions without interference from individual states pursuing their own immigration policies. "[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (quoting *Arizona v. United States*, 641 F.3d 339, 366 (2011), *aff'd in part*, 567

---

[16] To the extent Colorado asserts an interest in regulating conditions of confinement at immigration detention facilities, that interest is addressed by the comprehensive federal framework already in place. The PBNDS—over 455 pages of detailed standards—govern every subject HB 1276 purports to regulate—including food safety, medical care, environmental health, facility inspections, and detainee access to counsel—and federal law, as well as the AIPC Contract, provide for numerous mechanisms for oversight, inspections, and reporting. Colorado has no legitimate interest in duplicating or supplanting this federal regime.

U.S. 387). "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Arizona*, 641 F.3d at 366 (citation omitted).

**IV.    This Court should enter a permanent injunction and final judgment.**

For the foregoing reasons, GEO is entitled to a preliminary injunction against enforcement of HB 1276. Moreover, the legal questions in this case may be resolved based on the text of HB 1276, the AIPC Contract, and federal law, including the PBNDS, and require no further factual development. Permanent injunctive relief is therefore appropriate. *See, e.g.*, *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418 n.1 (1971) (noting that because there were no disputed factual questions, "the issuance of a permanent injunction [in addition to the already-ordered temporary injunction] will be little more than a formality"); *Banks v. Gonzales*, 415 F. Supp. 2d 1248, 1252 (N.D. Okla. 2006), *aff'd,* 490 F.3d 1178 (10th Cir. 2007) (because there were no "factual issues" and "the questions before the Court [were] solely questions of law," the court addressed a motion to dismiss and motion for permanent injunction simultaneously). This Court has authority to enter a permanent injunction and final judgment under Federal Rules of Civil Procedure 56(f) and 65(a)(2), and it may enter declaratory judgment on an expedited basis under Rule 57. There is no reason to delay doing so.

**CONCLUSION**

The Court should enjoin the Defendants from enforcing HB 1276 against GEO. In the alternative, the Court should grant partial relief by preliminarily or permanently enjoining enforcement of HB 1276 against GEO until the end of GEO's contract on October 15, 2026.

Dated: June 8, 2026.                    Respectfully submitted,


                                        s/ Frederick R. Yarger
                                        Frederick R. Yarger
                                        James N. Boeving
                                        Wheeler Trigg O'Donnell LLP
                                        370 Seventeenth Street, Suite 4500
                                        Denver, CO 80202
                                        Telephone:   303.244.1800
                                        Facsimile:    303.244.1879
                                        Email:   yarger@wtotrial.com
                                                    boeving@wtotrial.com

                                        Scott Allyn Schipma
                                        The GEO Group, Inc.
                                        4955 Technology Way
                                        Boca Raton, FL 99431
                                        Telephone:   561.999.7615
                                        Email:   scott.schipma@geogroup.com

                                        *Attorneys for Plaintiff*

26

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on June 8, 2026, I electronically filed the foregoing **THE GEO GROUP, INC.'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record registered through the CM/ECF system.

*s/ Frederick R. Yarger*