# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-2533-DDD-SP

THE GEO GROUP, INC.,

     Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado
Department of Public Health & Environment (CDPHE), in her
official capacity;

JEFF LAWRENCE, Director of the Environmental Health and
Sustainability Division of CDPHE, in his official capacity;

PHIL WEISER, Colorado Attorney General, in his official
capacity;

KELLY WEIDENBACH, Executive Director of the Adams County
Health Department, in her official capacity;

     Defendants.

---

## EXECUTIVE DIRECTOR KELLY WEIDENBACH'S RESPONSE IN OPPOSITION TO THE GEO GROUP, INC.'S MOTION FOR PRELIMINARY INJUCNTION

---

## INTRODUCTION

The GEO Group, Inc.'s (GEO) efforts notwithstanding, this is not a case about federal immigration policy. It is, rather, about public health and safety. More to the point, it is about whether a private corporation operating a privately-owned facility for profit can unilaterally exempt itself from state and local food and health inspections merely by invoking a federal contract that does not prohibit – and indeed requires – compliance with state and local laws. The Supremacy Clause does not require that result. GEO's privately-owned facility is located within the

1

jurisdiction of Adams County and is, therefore, subject to inspection like any other similarly situated facility – including Adams County's own detention facility. Allowing GEO on its own initiative to exempt itself from state and local food and health laws jeopardizes not only the health and safety of the detainees housed at the Aurora facility, but GEO's own employees and the surrounding members of the public. Moreover, GEO's motion barely mentions HB 26-1276 Section 2's Amendment of Colo. Rev. Stat. § 25-1-506, which is the only provision that relates to Executive Director Weidenbach or the Adams County Health Department (ACHD). Executive Director Weidenbach, therefore, respectfully requests the Court deny GEO's request for a preliminary injunction.

## FACTUAL BACKGROUND

The ACHD was established following Adams County's decision to withdraw from the Tri-County Health Department, a regional agency that had served Adams, Arapahoe, and Douglas counties for more than five decades. On January 1, 2023, ACHD began operations under the leadership of Dr. Kelly Weidenbach as the Executive Director. Ex. A, Weidenbach Aff., ¶¶ 2-3.

ACHD is a locally governed public health agency created pursuant to statute and charged with implementing and enforcing public health and safety laws pursuant to the Colorado Public Health Act. *See* Colo. Rev. Stat. § 25-1-100.3, *et seq*. Specifically, county public health agencies are authorized to administer and enforce public health laws; investigate and control conditions affecting public health, including communicable diseases; investigate and abate public health nuisances; and "make necessary sanitation and health investigations and inspections" on their own initiative for matters within their jurisdiction. Colo. Rev. Stat. § 25-1-506(3)(b). These provisions

provide legal authority for ACHD to inspect all facilities located within the county, including public and private detention facilities.

For example, the Adams County Detention Facility (ACDF) sits within Adams County. The ACDF is responsible for the secure custody, care, and supervision of individuals who have been arrested and are awaiting trial, sentencing, or transfer, as well as individuals serving sentences imposed by the state courts for offenses within the jurisdiction of Adams County. ACHD has conducted public health investigations and inspections at the ACDF in furtherance of its statutory responsibility to protect public health within the county. These investigations have included evaluations of environmental health conditions, sanitation practices, communicable disease prevention, food safety, and other matters that could impact the health of incarcerated individuals, facility staff, and the surrounding community. Ex. A, Weidenbach Aff., ¶5. The ACDF has provided ACHD all necessary and requested access to detainees, staff, and facilities. Such access has never been denied or impeded by ACDF leadership or management. *Id.* at ¶ 6.

The Aurora ICE Processing Center (AIPC) also sits within Adams County. The facility is operated by GEO, a private corrections company, under contract with ICE. Public records identify GEO or its subsidiaries, not the federal government, as the owner of six parcels comprising the AIPC.[1] Because the property is privately owned, it is subject to local property taxation, unlike many government-owned facilities that are exempt from property taxes. As a result, property taxes are assessed to, and, paid by GEO on the parcels comprising the AIPC site.

Although the facilities operate under different legal authorities – the ACDF under the Adams County Sheriff, Colo. Rev. Stat. §§ 17-26-101 to 103; *id.* at 30-10-511, and the AIPC under

---

[1] Property records can be found at: https://gisapp.adcogov.org/PropertySearch.

contract with ICE – both present substantially similar public health considerations. Importantly, both the AIPC and the ACDF are secure detention facilities located in Adams County that house individuals in government custody and provide for those individuals' basic needs including housing, meals, medical care, sanitation, and security. Both facilities operate continuously and maintain congregate living environments where communicable disease prevention, environmental health, food safety, water quality, waste disposal, and sanitation practices are essential to protecting the health of detainees, staff, visitors, and local community.

In January, 2026, ACHD received multiple complaints of communicable disease activity of a gastrointestinal nature occurring in the AIPC. These reports warranted investigation by the ACHD and lead to the need for an on-site investigation. While ACHD officials were permitted on-site at this time, GEO imposed certain restrictions on ACHD's access to GEO personnel which led to limitations in ACHD's ability to obtain timely interviews of GEO staff. ACHD also encountered issues obtaining needed operational information required to assess the reported illness conditions and evaluate the potential communicable disease risks. Ex. A, Weidenbach Aff., ¶¶ 7-10.

HB 26-1276 went into effect on June, 4, 2026 when it was signed into law by Governor Polis. (ECF 2 at 6.) At around that same time, a report of an individual who tested positive for tuberculosis was received by the ACHD. Tuberculosis is a "potentially fatal contagious disease" and poses significant risks to populations contained in congregate detention settings. Colo. Rev. Stat. § 25-4-500.3(16). Reports of tuberculosis are mandatorily required to be reported and require investigation and implementation of coherent and consistent strategy in order to control outbreaks. Colo. Rev. Stat. §§ 25-4-500.3, 501. At present, GEO purportedly via ICE has imposed significant

4

barriers to ACHD's ability to meet its statutorily required tuberculosis investigation. <mark>Ex. A, Weidenbach Aff. ___.</mark>

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). To be entitled to a preliminary injunction under Fed. R. Civ. P. 65, the moving party must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) irreparable harm is likely unless the injunction is issued; (3) the balance of equities tips in favor of the movant, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013) (en banc); *Uber Techs., Inc. v. Moss*, No. 1:25-cv-00096-DDD-KAS, 2025 WL 1420940, *5-6 (D. Colo. Jan. 31, 2025).

Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). A pre-enforcement preliminary injunction based on a facial challenge, such as the one sought here, "is particularly fraught[.]" *Uber Techs., Inc.*, 2025 WL 1420940, at *6 (citations omitted). If the movant fails to establish even one of the four required elements, the Court must deny the motion. *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013); *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). Here, GEO fails to establish that even one of these factors clearly and unequivocally weighs in its favor. The Court should, therefore, deny GEO's motion for a preliminary injunction.

I.    **GEO'S MOTION FOR AN INJUNCTION FAILS TO MAKE A PRIMA FACIE SHOWING SUFFICIENT TO ENJOIN EXECUTIVE DIRECTOR WEIDENBACH OR ACHD FROM IMPLEMENTING SECTION 2 OF HB 26-1276'S AMENDMENT OF COLO. REV. STAT. § 25-1-506.**

In order to obtain an injunction against Executive Director Weidenbach, GEO must establish all four injunction factors against her. *Fed. Deposit Ins. Corp. v. Antonio*, 649 F. Supp. 1352, 1355 (D. Colo. 1986) ("Because different defendants, or categories of defendants, were involved in different conduct, it is necessary to consider each defendant and category separately to decide whether an injunction is appropriate."), *aff'd*, 843 F.2d 1311 (10th Cir. 1988); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("standing is not dispensed in gross"). Paramount among these requirements is the need for GEO to identify constitutionally suspect powers or duties given to Executive Director Weidenbach under one or more of the provisions of HB 26-1276 as distinct from the powers and duties given to the Colorado Attorney General or the CDPHE. *See Ex Parte Young*, 209 U.S. 123, 160 (1908) (permitting injunctions against an individual officer for her own "individual conduct"). Here, only Section 2 of HB 26-1276 purports to convey new powers or responsibilities to ACHD by amending Colo. Rev. Stat. § 25-1-506.

GEO's motion for a preliminary injunction, however, is very nearly silent as to why it seeks to enjoin Executive Director Weidenbach in this case. GEO's motion for injunction contains only a single reference to Colo. Rev. Stat. § 25-1-506 or HB 26-1276, Section 2. That reference, moreover, is only located in a footnote. (ECF 2 at 13, n.7.) Neither that footnote nor any other portion of the motion explains how Section 2 of HB 26-1276's amendment of Colo. Rev. Stat. § 25-1-506 violates any federal constitutional provision. Neither of the declarations offered in support of the motion reference any burdens allegedly created by HB 26-1276, let alone any supposedly created by Section 2 specifically. (*See* ECF 4 (Declaration of Daniel Ragsdale) & 5

6

(Declaration of Stephen Winiarski).) Nor does either declaration mention Executive Director Weidenbach or the ACHD.

The complaint hardly helps. Executive Director Weidenbach and ACHD are mentioned in only two cursory introductory paragraphs in GEO's complaint. (ECF 1 at 2, 5, ¶¶ 1 & 13.) Here, the complaint states only that Executive Director Weidenbach was named because ACHD "*has been* responsible for managing investigations related to epidemics or communicable diseases at the federal detention facility as set forth in HB 1276," (ECF 1 at 5, ¶ 13) which allegation raises the specter of objections that reach back to ACHD's pre-enactment investigations at the Aurora Facility. (*Accord* ECF 2 at 6 (June 4, 2026 effective date of HB 26-1276); *see also* ECF 1 at 5, ¶ 14 ("GEO seeks relief on all claims pursuant to . . . 42 U.S.C. § 1983.")).

Elsewhere in the complaint, GEO flags Section 2 of HB 26-1276's amendment of Colo. Rev. Stat. § 25-1-506, which "purports to provide County or district public health agencies" with additional investigatory authority. (ECF 1 at 5-6, ¶ 21; *see also id.* at 38, Prayer for Relief, ¶¶ a & b.) Although the complaint does repeatedly allege HB 26-1276 Section 2 is unconstitutional (ECF 1 at 27, 29, 33, 34, 35, 36; ¶¶ 66, 71, 77, 78, 95, 96, 100, 101, 108, 109, 112, 115), those conclusions are never explicated in GEO's motion. Such legal allegations contained only in an unverified complaint are afforded no weight in determining whether a preliminary injunction should be issued. *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009); *Pelletier v. United States*, No. 11-cv-01377-WJM-CBS, 2011 U.S. Dist. LEXIS 56648, *6 (D. Colo. May 25, 2011), *citing* 11A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2949 (2d ed.

1995). These allegations, moreover, are often demonstrably incorrect *as to Section 2* as revealed by a facial reading of the bill.[2]

In sum, not only the gravamen, but nearly the entire focus of GEO's motion for an injunction is aimed at Colo. Rev. Stat. § 25-1.5-101, as amended by HB 26-1276 *Section 3*. But HB 26-1276 Section 3 grants no new powers to and imposes no new "responsibilities" on Executive Director Weidenbach or ACHD. Under these circumstances, even if the Court were to enjoin some portions of Section of HB 26-1276 or Colo. Rev. Stat. § 25-1.5-101 (which it should not), GEO has failed to a make even a prima facie showing that *Section 2*'s amendment of Colo. Rev. Stat. § 25-1-506 should be similarly treated. Thus, absent any stated basis to enjoin Executive Director Weidenbach or ACHD, the Court should deny GEO's motion for a preliminary injunction at least as to them.

## II.    HB 26-1276 SECTION 2'S AMENDMENT OF COLO. REV. STAT. § 25-1-506 IS SEVERABLE FROM ANY OTHER POTENTIALLY UNCONSTITUTIONAL PROVISIONS OF THE BILL.

A federal court, when construing a state statute, must not only proceed under the "strong presumption favoring the constitutionality of statutes" that requires "courts to construe laws in a constitutional manner[,]" *United States v. Murphy*, 977 F.2d 503, 505 (10th Cir. 1992) (quotation omitted), but it must also consider whether severing an unconstitutional provision pursuant to the rules of the applicable state may save the remainder of the statute. *Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1362-63 (10th Cir. 1981). *See also Brockett v. Spokane Arcades, Inc.*, 472 U.S.

---

[2] For example, Section 2 does not "directly regulate the United States' operation of federal detention facilities[,]" (ECF 1 at 26-27, ¶ 71)," nor does it "grant the state virtual power of review over the federal determination of contractor qualification and responsibility." (*Id.* at 35, ¶ 108.)

491, 502 (1985); *Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1194 & 1195-96 (10th Cir. 2000).

Under Colorado law, if a state constitutional amendment "is constitutional in one part and unconstitutional in another, the constitutional provision may be sustained and the unconstitutional stricken." *City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 70 (Colo. 1981). Colorado courts will "strike as little of the law as possible, with a preference for only partial, not complete, invalidation." *Dallman v. Ritter*, 225 P.3d 610, 638 (Colo. 2010). *See also Rodriguez v. Schutt*, 914 P.2d 921, 929 (Colo. 1996). "Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portions remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body." *Dallman*, 225 P.3d at 638.

Here, Section 2 of HB 26-1276 amends Colo. Rev. Stat. § 25-1-506 merely to make explicit what was previously implicit – that privately operated detention facilities are subject to the jurisdiction of county health departments, like ACHD. Nothing about Section 2's clarification of that jurisdiction is contingent on or tied to any of the provisions of Colo. Rev. Stat. § 25-1.5-101, as amended by HB 26-1276, Section 3. Thus, Section 2 is entirely autonomous from any hypothetically objectionable provisions contained in HB 26-1276, Section 3. As for legislative intent, Section 9 of HB 26-1276 contains an express severability provision. Thus, even if the Court were to grant an injunction against some portion of Section 3, the Court should not, therefore, enjoin Section 2. *See United States v. California*, 921 F.3d 865, 884 (9th Cir. 2019) ("Only those provisions that impose an additional economic burden exclusively on the federal government are invalid under the doctrine of intergovernmental immunity").

9

III.    **GEO IS UNLIKELY TO SUCCEED ON THE MERITS OF ANY OF ITS FIVE CLAIMS ESPECIALLY AS THEY MIGHT PERTAIN TO HB 26-1276 SECTION 2'S AMENDMENT OF COLO. REV. STAT. § 25-1-506.**

GEO begins the heart of its motion by arguing that is likely to succeed on each of its five claims. But again, with the exception of footnote 9, GEO's motion contains no argument setting out how Section 2 of HB 26-1276 allegedly violates the U.S. Constitution. For completeness, Executive Director Weidenbach addresses each of GEO's arguments as they might theoretically pertain to Section 2 of HB 26-1276.

A.    **Section 2 of HB 26-1276 does not directly regulate federal activities or impermissibly discriminate against the Federal Government in violation of the intergovernmental immunity doctrine (Counts I & II).**

The intergovernmental immunity doctrine prohibits "state laws that *either* regulate the United States directly or discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors)." *United States v. Washington*, 596 U.S. 832, 838-839 (2022) (cleaned up). A "state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *Id.* at 839 (cleaned up). "But those who contract to furnish supplies or render services to the government are not [federal] agencies and do not perform governmental functions." *Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U. S. 261, 269 (1943). "Accordingly, absent a statute to the contrary, States can regulate or tax federal contractors on the same terms as any private company, even where the party asserts an indirect burden on federal activities." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1098-99 (April 22, 2026). This power extends to generally applicable state and local health and safety laws. *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985) (recognizing a "presumption that state or local regulation of matters

10

related to health and safety is not invalidated under the Supremacy Clause."); *United States v. California*, 921 F.3d at 885-86 (upholding state inspection regime of federal immigration facilities).

Here, Section 2 of HB 26-1276 does not directly or indirectly discriminate against the Federal Government or those with which it deals. It simply clarifies that ACHD's preexisting authority extends to the discretionary duty "to inspect or examine a facility that houses or detains individuals who are noncitizens for purposes of civil immigration proceedings." (ECF 3-3 at 3, Ex. B, HB 26-1276 (cleaned up).) Neither Section 2 nor Colo. Rev. Stat. § 25-1-506 as a whole seeks to prevent the Federal Government, private contractors, or cooperating state or local agencies from operating an immigration detention facility. They do not create separate or more burdensome health standards beyond the standards imposed on every other facility located in the jurisdiction (including the County's own jail). And Section 2 imposes no new obligations or penalties of any kind on immigration detention facilities. In short, nothing about Section 2 on its face triggers the concerns protected against by the intergovernmental immunity doctrine.

In arguing that HB 26-1276 directly regulates federal activities in violation of the intergovernmental immunity doctrine, GEO primarily relies on two out-of-circuit appellate cases: *CoreCivic, Inc. v. New Jersey*, 145 F.4th 315 (3d Cir. 2025) and *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), (ECF 2 at 10-13; *see also* ECF 1 at 25, 27-28, ¶¶ 64 & 71), neither of which have ever been cited to by this Court or the Tenth Circuit.

*CoreCivic* involved a New Jersey statute that was passed a with the specific "'intent' to forbid new contracts for civil immigration detention," which is simply inapposite to the provisions

of HB 26-1276 as a whole, and to Section 2 specifically – neither of which attempt undertake either an absolute or partial ban on contracts to operate immigration detention facilities.

As for *Boeing Co. v. Movassaghi*, it too is distinguishable from the circumstances presented by HB 26-1276. In the first instance, *Movassaghi* involved the direct environmental regulation of a site for which the Federal Government was the responsible party. This was deemed tantamount to imposing a higher clean-up standard directly on the Federal Government than those otherwise required under federal law and, consequently, overriding federal contracting decisions. 768 F.3d 832, 839; *see also Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022). That concern is distinguishable from the merely incidental burdens of compliance with general public health regulations - as the Ninth Circuit has itself twice noted. *Newsom*, 50 F.4th at, 760; *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1117 (9th Cir. 2025).

Similarly, GEO relies in two footnotes on a dissent from the denial of rehearing en banc in *The GEO Group, Inc. v. Inslee*, 166 F.4th 1188, 1193 (9th Cir. 2026) (Bumatay, J., et al., dissenting from the denial of rehearing en banc) (ECF 2 at 12, n.12 & 14, n. 13), which is inapposite to HB 26-1276 in general and Section 2 specifically. The underlying Ninth Circuit panel decision in *Inslee* was concerned about a bill that potentially treated detainees held at privately operated detention facilities in a manner categorically distinct from both state operated prisons and jails. *The GEO Group, Inc. v. Inslee*, 151 F.4th 1107, 1118-22 (9th Cir. 2025). By contrast, Section 2 of HB 26-1276 modifies an existing and extensive statutory scheme. In doing so, it endeavors to close a potential statutory gap exposed by GEO's past efforts to restrict health inspector's access to the AIPC. Per force, this kind of stop gap provision will be targeted to close those specific gaps or ambiguities. Requiring amendatory bills to restate and reenact all existing statutory standards to

12

avoid targeted discrimination objections is simply not the position that the *Inslee* dissent advanced. In any event, as GEO acknowledges, at least parts of HB 26-1276 do apply to "'local' or 'county,' facilities" (ECF 2 at 14, n.13), which was not the case with the Washington bill at issue in *Inslee*. *See Inslee*, 166 F.4th at 1191 (9th Cir. 2026) (Bumatay, J., et al., dissenting) Nor does Colo. Rev. Stat. § 25-1-506 discriminate on the basis of ownership. The statute broadly covers facilities – including local government facilities like the ACDF – within the jurisdiction of the County.

In sum, Section 2 of HB 26-1276 does not directly regulate federal activities or impermissibly discriminate against the Federal Government in violation of either species of the intergovernmental immunity doctrine.

**B.    Section 2 of HB 26-1276 is not field or conflict preempted by the Federal Government's regulation of immigration detention (Counts III & IV).**

As relevant here, federal law preempts state law in two scenarios: (1) when Congress has occupied the "field," enacting a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it[,]" *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), or (2) "where it is impossible for a private party to comply with both state and federal law and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (citations omitted). There is, however, a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Automated Med. Labs., Inc.*, 471 U.S. at 715 (1985). The Supreme Court "has never held that every state enactment which in any way deals with [noncitizens] is a regulation of immigration and thus per se preempted by this constitutional power." *De Canas v. Bica*, 424 U.S. 351, 355 (1976). To overcome the

13

presumption against preemption, the challenging party must show a "clear and manifest purpose of Congress" to preempt state law. *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citations omitted). Here, GEO has failed to do so.

First, nothing in the four statutes invoked by GEO show a clear and manifest purpose of Congress to preempt state and local public health and safety rules or to exempt privately-run detention facilities from their ambit. (ECF 2 at 2, citing 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2); 28 U.S.C. 530C(a)(4); 18 U.S.C. § 4013, note, "Contracts for Space or Facilities." Statutory silence as to state and local public health and safety rules does not satisfy the clear and manifest preemption standard. *Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990).

Second, GEO's invocation of ICE's 2011 Prison Based National Detention Standards (PBNDS) also does not warrant the preemption of state and local public health and safety. First, GEO has not established such agency standards are entitled to preemptive force on par with an act of Congress. *See Dep't of Lab. & Indus. of Wash. v. GEO Secure Servs., LLC*, No. C24-5095 BHS, 2024 U.S. Dist. LEXIS 115837, 27 & n. 12 (W.D. Wash. July 1, 2024) ("Because the PBNDS is a mere agency publication, not a federal law, it cannot serve as a basis for a preemption defense."). Second, even if the PBNDS should receive such treatment, they too fail to show a clear and manifest purpose to preempt state and local public health and safety rules or to exempt privately-run detention facilities from their ambit. To the contrary, they require compliance with state and local health regulations. For example, in Section 1.2(II) of Environmental Health and Safety, the PBNDS provide:

> The expected outcomes of this detention standard are as follows (specific requirements are defined in "V. Expected Practices"). […]

2. *Compliance with all applicable* federal, *state and local safety and sanitation laws* shall be ensured by documented internal and external inspections, and by corrective action when indicated.

(ECF 5-3 at 24 (emphasis added).) Or again, in Section 4.3(V)(C)(1) of Medical Care, the

PBNDS require:

Each facility shall have written plans that address the management of infectious and communicable diseases, including screening, prevention, education, identification, monitoring and surveillance, immunization (when applicable), treatment, follow-up, isolation (when indicated) and *reporting to local, state* and federal *agencies*.

Plans *shall include*:

a. *coordination with local public health authorities*; [… and]

h. management of infectious diseases *and reporting them to local and/or state health departments in accordance with established guidelines and applicable laws*[.]

Facilities *shall comply with current and future plans implemented by* federal, *state or local authorities addressing specific public health issues* including communicable disease reporting requirements.

(ECF 5-3 at 266-67 (emphasis added).)

Thus, GEO simply misstates the actual provisions of the PBNDS when it claims "the

PBNDS prescribe detailed standards governing food services, medical care, environmental health,

and access to medical and legal services—all of which are subject to federal, *not state*, oversight."

(ECF 2 at 25 (emphasis added).) To the contrary, the PBNDS actually require the very thing GEO

now seeks to avoid through this lawsuit – compliance with state and local public health and safety

laws.

Finally, GEO's contract term argument fares no better than its PBNDS argument. A

contract is not a federal law. *See Empire Healthchoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 156

(2nd Cir. 2005) ("[T]he terms of a federal contract cannot by themselves preempt state law; only

15

federal law can preempt state law."). And the plain language of the contract, in at least two places, again expressly requires GEO to comply with state and local laws:

> The Contractor shall comply with *all applicable federal, state, and local laws* and all applicable Occupational Safety and Health Administration (OSHA) standards.

(ECF 4-1 at 35 (emphasis added)), and, more specifically:

> The Contractor agrees to accept and provide for the secure custody, care, and safekeeping of detainees *in accordance with the State and local laws, standards, policies*, procedures for firearms requirements, or court orders applicable to the operations of the facility.

(*Id.* at 34 (emphasis added).) The mere fact that GEO's contract gives the Federal Government a right to inspect the AIPC does not amount to an exclusive reservation of that right as GEO attempts to cast it. (ECF 2 at 7-8 & 25.) That provision is simply silent as to the right of state and local health inspectors to visit the site and its silence cannot override the other provisions of the contract or the PBNDS that require GEO to comply with state and local law in such areas. Thus, GEO has failed to establish either field or conflict preemption as to HB 26-1276 generally, or Section 2 specifically.

### C.     Section 2 of HB 26-1276 does not violate the Contract Clause (Count V).

In order to establish a Contract Clause violation, GEO must show, among other things, that HB 26-1276 in general, and Section 2 in particular, substantially impairs its contractual relationship with ICE. *Sveen v. Melin*, 584 U.S. 811, 819 (2018).

Simply put, GEO's Contract Clause claim founders on the terms of its own contract, which are set forth in Section III.B above. The plain language of the contract, in at least two places, expressly requires GEO to comply with state and local laws. So too do the relevant PBNDS, which GEO asserts are incorporated into its contract. (ECF 2 at 4.) GEO's assertion, therefore, that it

16

"reasonably expected that its contractual obligations would be governed by federal law, not by a patchwork of conflicting state requirements[,]" (*Id.* at 21), is plainly belied by the express terms of its own contract with ICE. In light of the actual terms of the contract and PBNDS, GEO has not made a prima facie showing that compliance with HB 26-1276 in general, or Section 2 in particular, "would require GEO to breach multiple explicit contractual requirements[.]" (*Id.*) Nor is this the first occasion where GEO has asserted its ICE contracts require more than they actually do. *See, e.g.*, *Menocal v. Geo Grp., Inc.*, 635 F. Supp. 3d 1151, 1173 (D. Colo. 2022), *remanded for further proceedings by Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 442 & 452 (2026). GEO, thus, has not established a reasonable likelihood of success on its Contract Clause claim.

## IV.     GEO HAS NOT ESTABLISHED IT WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

GEO asserts four separate potential irreparable harms in the event HB 26-1276 becomes operative: (1) the existence of constitutional injury; (2) interference with law enforcement initiatives; (3) potential breaches of its contract with ICE and possibly contract termination; and (4) burdensome operational changes. None of these naked assertions, however, are sufficient to establish the irreparable harm element required for the issuance of a preliminary injunction, let alone as to Section 2 specifically.

As set out above, GEO has not made prima facie showing that Section 2 violates its personal constitutional rights under the Contract Clause, nor are violations of the Contract Clause presumed as a matter of course, to establish irreparable harm. *See Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (N.D.N.Y. 2012). Rather, the constitutional deprivation must be convincingly shown and the violation must be demonstrated to carry noncompensable damages. *Id.* Such harm, moreover, "cannot be purely theoretical." *Id.* But theory is all that GEO offers here. GEO has not

17

established any cost-based increases connected to compliance with Section 2 of HB 26-1276. Nor has GEO established that any of these unknown and unstated costs could not be recouped under the express terms of its contract, which provides for the possibility of price adjustments. (*See*, *e.g.*, ECF 4-1 at 103 (subsection (2) & (3).)

As for GEO's assertion of interference with federal law enforcement functions, these are derivative interests that belong to Federal Government, which is not a party here. Even if GEO could derivatively assert that interest, GEO simply has not established that the implementation of Section 2 of HB 26-1276 will irreparably harm it under the actual terms and conditions of the PBNDS or its contract, which require compliance with state and local public health laws.

## V.  NEITHER THE BALANCE OF THE EQUITIES NOR THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

Executive Director Weidenbach acknowledges the Federal Government has a significant interest in the uniform enforcement of federal immigration laws. Nothing in HB 26-1276, however, expressly or by implication attempts to modify or thwart the enforcement of federal immigration laws. That, however, is not the only interest implicated by GEO's motion for a preliminary injunction. What HB 26-1276 expressly attempts to address, especially in Section 2, are the recent efforts by GEO to partially or completely exempt itself from the enforcement of state and local health laws merely by invoking a federal contract that does not prohibit – and indeed requires – compliance with state and local public health and safety laws. State and local governments too have an inarguably compelling public interest at stake – to enforce public health and safety laws, especially where communicable diseases like tuberculous are involved. *See Automated Med. Labs., Inc.*, 471 U.S. at 715 (1985); *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). GEO is not asking for a narrow or minor accommodation or adjustment. By challenging Section 2 of HB 26-

18

1276 GEO seeks a categorical exemption from the enforcement of state and local public health and safety laws. The fact GEO happens to provide immigration detention services for the Federal Government pursuant to a private contract does not tip either the balance of equities or the public interest in favor of granting an injunction to stop the enforcement of public health laws. *Accord Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 843 (D. Colo. Oct. 15, 2020). At most those two factors are in equipoise, but that would require the denial of GEO's request for an injunction. *See*, *e.g.*, *SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1101-02 (10th Cir. 1991).

## CONCLUSION

For the foregoing reasons, Executive Director Weidenbach respectfully requests the Court deny GEO's request for an injunction barring the enforcement of HB 26-1276.

DATED:  July 1,  2026                    Respectfully submitted,

                                        *s/Michael A. Sink*
                                        Michael A. Sink
                                        Kerri A. Booth
                                        Assistant County Attorneys
                                        4430 S. Adams County Pkwy
                                        5th Floor, Suite C5000B
                                        Brighton, CO  80601
                                        Phone: (720) 523-6116
                                        Fax: (720) 523-6114
                                        msink@adamscountyco.gov
                                        kbooth@adamscountyco.gov

                                        *Counsel for Kelly Weidenbach*


## STATEMENT

I hereby certify that the foregoing paper complies with the length limitation set forth in DDD Civ. P.S. III(A)(1).

19

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*s/ Michael A. Sink*
Michael A. Sink
Kerri A. Booth
Assistant County Attorneys
4430 S. Adams County Pkwy
5th Floor, Suite C5000B
Brighton, CO 80601
Phone: (720) 523-6116
Fax: (720) 523-6114
msink@adamscountyco.gov
kbooth@adamscountyco.gov

*Counsel for Kelly Weidenbach*

20