**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Daniel D. Domenico**

Civil Action No. 1:26-cv-02533-DDD-SBP

THE GEO GROUP, INC.,

Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado Department of Public Health & Environment (CDPHE), in her official capacity;
JEFF LAWRENCE, Director of the Environmental Health and Sustainability Division of CDPHE, in his official capacity;
PHIL WEISER, Colorado Attorney General, in his official capacity;
KELLY WEIDENBACH, Executive Director of the Adams County Health Department, in her official capacity;

Defendants.

---

# ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

---

Colorado has a multitude of state and local health and safety laws and regulations that apply to public facilities throughout the state. The United States government has contracted with The GEO Group, Inc., to operate a civil immigration detention facility known as the "Aurora ICE Processing Center." GEO does not in this case dispute that those longstanding provisions apply to the Aurora facility. GEO's challenge is to a newly enacted law that applies only to "a facility that houses or detains individuals who are noncitizens for the purposes of civil immigration proceedings . . . operated on behalf of or pursuant to a contract with federal immigration authorities." Colorado House Bill 26-1276 (HB 1276) at 3, 5. GEO objects, arguing that the additional requirements of

the law single it out as a federal contractor and require it to violate its contract with the federal government, both grounds for preemption. I agree as to one part of the new law, and therefore grant GEO's motion for a preliminary injunction in part.

## BACKGROUND

U.S. Immigrations and Custom Enforcement has authority to use private contractors to fulfil its statutory immigration detention obligations. 18 U.S.C. § 401. It has done so in Colorado by contracting with GEO Group to operate the Aurora Processing Center. Doc. 1 at 13 ¶ 33. This facility is subject to oversight by ICE and the Department of Justice. *Id.* ¶ 36. The way in which GEO operates and staffs this facility is determined by its contract with ICE as well as the Performance Based National Detention Standards ("PBNDS") required by the federal government and incorporated into the contract. *Id.* ¶¶ 36, 40. These two documents control record keeping, security, law enforcement access, medical staffing, and inspections.

Colorado passed HB 26-1276 to expand and clarify state and county authority over the GEO detention facility. The legislation covers a private facility "that houses or detains individuals who are noncitizens for the purposes of civil immigration proceedings, including a facility that is operated on behalf of or pursuant to a contract with federal immigration authorities." HB 1276 at (i)(I)(D), (dd)(I). The Colorado Legislative Council Staff noted that, as of May 2026, the GEO detention center was the only facility that qualifies for the additional regulation. *Id.* at 10 ¶ 23.

The new bill contains three sets of changes to Colorado law:

**(1)** Section 2 of the bill makes several minor changes to Colorado Rev. Stat. § 25-1-506, making explicit that counties have a discretionary duty

to inspect immigration holding facilities.

**(2)** The first portion of Section 3 of the bill amends Colorado Rev. Stat. § 25-1.5-101(i)(I)(D). For lack of any simpler nomenclature, I will refer to this as the (i)(I)(D) provision. This provision requires that:

> Unannounced inspections and examinations must be made at least one time every three months, and may be made more frequently, and the facility shall pay for the inspections and examinations. The inspections and examinations made pursuant to this subsection (1)(i)(I)(D) must include a review of the following: Adherence to food safety standards and drinking water quality standards, confinement conditions, and standards of care provided to individuals who are detained in the facility. The facility shall provide to a department representative who is conducting an inspection or examination pursuant to this subsection (1)(i)(I)(D), or an investigation related to an epidemic or communicable disease, all access necessary to perform the inspection or investigation, including access to people who are detained, records, facility officials, and facility personnel. If a facility refuses to allow an inspection or examination pursuant to this subsection (1)(i)(I)(D) or investigation related to an epidemic or communicable disease, the facility is liable for a civil penalty of not more than fifty thousand dollars for each refusal.

**(3)** The last relevant portion of Section 3 adds a new subsection § 25-1.5-101(1)(dd). This will be referred to as the (1)(dd) provision, and provides that:

> (I) With respect to a facility that houses or detains individuals who are noncitizens for purposes of civil immigration proceedings, the power to require the facility to:
>
> (A) Provide to the department a yearly report detailing the following: The outcomes of pregnant individuals in the facility, outcomes of individuals with chronic health conditions, outcomes of individuals with disabilities, access to food for individuals with dietary restrictions, average temperature within the facility, highest and lowest temperatures recorded within the facility, individuals' access to an

> attorney, and individuals' access to spaces of worship or silent reflection;
>
> (B) Prohibit the housing or detention of a minor in the same room as a nonfamilial adult; and
>
> (C) On the facility's site and at all times, staff the facility with medical professionals and mental health professionals who are accessible to individuals who are noncitizens and detained for purposes of civil immigration proceedings.
>
> (II)(A) If a facility fails to comply with a requirement imposed by the department pursuant to this subsection (1)(dd), the facility is liable for a civil penalty of not more than fifty thousand dollars for each violation.
>
> (B) The attorney general may bring an action to enforce this subsection (1)(dd), including an action seeking a civil penalty.
>
> (C) Any civil penalty money collected pursuant to this subsection (1)(dd) must be transferred to the state treasurer, who shall credit the money to the immigration legal defense fund established pursuant to section 8-3.8-101.

In sum, Section 2 clarifies that counties have authority to conduct inspections, (i)(I)(D) expands the frequency and nature of the inspection regime paired with new penalties for noncompliance, and (dd)(I) grants Colorado new regulatory authority to promulgate rules setting staffing and record keeping requirements paired with the same enhanced penalty scheme.

Pursuant to preexisting laws and regulations, Defendants Colorado and Adams County[1] have already been inspecting the Aurora facility concurrently with the federal government. Doc. 23 at 5-6. GEO does not in this case object to those inspections or preexisting laws. But it objects

---

[1] Technically, the Defendants here are individuals with regulatory and enforcement authority on behalf of the State of Colorado and Adams County, Colorado. But for simplicity’s sake, I will refer to them by their entity names unless more specificity is required.

to the additional requirements of SB 1276 and filed this suit seeking both a preliminary and permanent injunction against enforcement of any of the changes in HB 1276. Colorado argues that these changes are simply the clarification and harmonization of its treatment of the Aurora facility with other private detention facilities, and that its inspections and regulations are ordinary exercises of its police powers.

Colorado submitted declarations explaining current practice and their views of how HB 1276 would change it. Docs. 23-1, 23-2. Colorado's declarations explained that the character of its inspections would remain the same but with more frequency until new regulations were drafted, and that Colorado's own contracts with private detention facilities contained contractual enforcement clauses. GEO submitted a copy of its contract and ICE standards it is required to comply with. Docs. 3-1, 3-5. I held a hearing on the motion on July 31, 2026. Doc. 30.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018). To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunction; (3) that its "threatened injury" without the injunction outweighs the opposing party's under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**DISCUSSION**

The Supremacy Clause of the United States Constitution provides that the "Laws of the United States" are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. This ensures that "the activities of the Federal government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Colorado claims that it is fulfilling its police powers authority to supervise a facility within its borders. GEO retorts that this state regulation is preempted by federal legislation and authority over immigration matters.

A state law violates the Supremacy Clause where it "involve[s] a direct, physical interference with federal activities . . . or some direct, immediate burden on the performance of [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945). This includes neutral, generally applicable laws that substantially burden federal activity. *E.g.*, *Hancock v. Train*, 426 U.S. 167, 179–80 (1976); *Mayo v. United States*, 319 U.S. 441, 447–48 (1943); *Arizona v. California*, 283 U.S. 423, 451 (1931); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920). It also can include state regulations of private contractors carrying out federal operations. *Osborn v. Bank of the United States*, 22 U.S. 738, 867 (1824).

In particular, GEO claims, HB 1276 violates what's known as the intergovernmental immunity doctrine. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.). This doctrine prevents a state from directly regulating the federal government or those with whom the federal government deals. *Id.* GEO argues that Colorado is trying to do indirectly what it recognizes it cannot do directly.

"[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). GEO claims as much and need not make a separate

constitutional claim. *Green Room LLC v. Wyoming*, 157 F.4th 1196, 1206 n.4 (10th Cir. 2025) (citing *Armstrong*). And for the following reasons, it is entitled to a limited preliminary injunction through the end of its current contract, October 15, 2026 for HB 1276's modifications to (i)(I)(D).

## I. Preemption

The Defendants do not dispute that, by focusing on immigration-related facilities, HB 1276 is limited to facilities that by their nature are carrying out federal policies, or that in fact it only applies to GEO's Aurora facility and nowhere else in the state. Indeed, state law prohibits state facilities from assisting in immigration-related detention. Colorado Rev. Stat. §§ 24-76.6-101, 24-76.7-103. The bill therefore facially singles out federal activity for state regulation. That is typically enough for preemption. *United States v. Washington*, 596 U.S. 832, 839 (2022). A state law impermissibly discriminates against the federal government or its contractors if it "single[s them] out" for less favorable "treatment," *Washington v. United States*, 460 U.S. 536, 546 (1983), or if it regulates them unfavorably on some basis related to their governmental "status," *North Dakota v. United States*, 495 U.S. 423, 438 (1990).

Colorado argues that the bill is nonetheless permissible because it simply puts GEO on the same footing as other private detention facilities, such as those operating prisons. Doc. 23 at 22. Had the state passed a law requiring that immigration facilities comply with the same regulations as such facilities carrying out state policies, this argument might be persuasive. *See, e.g.*, *The Geo Group, Inc. v. Inslee*, 151 F.4th 1107, 1112 (9th Cir. 2025). In *Inslee*, the Ninth Circuit addressed such a law and found that it treated other civil detention facilities substantially the same, finding plenty of comparators for the regulations applies to the civil immigration detention facility. *Id.* at 1120.

Here, GEO has shown that it is singled out for a special bill that applies to no other facility. That other facilities might have some similar regulatory burdens does not change the fact that none of them are required to comply with HB 1276. As GEO notes, the extent of the additional burden is irrelevant for purposes of this test. *United States v. Washington*, 596 U.S. 832, 839 (2022).

And in fact, at least some of the burdens of this bill are unique. The requirement of a certain number of unannounced visits, for example, does not appear elsewhere. And the state acknowledges that the penalty scheme is not imposed on other facilities. The bill (and Defendants) acknowledge that they could not constitutionally regulate a federally-operated facility in this manner.

HB 1276 applies only to civilian detention centers, of which there is one. And though Colorado argues that the law only brings GEO into compliance with existing state regulations applied to other detention facilities, that law singles out this one category of facility for a separately defined set of restrictions and rulemaking. And that is sufficient to establish that HB 1276 discriminates against GEO based on its status as a federal contractor.

Colorado responds that GEO's contract requires it to comply with state law. There are several contractual provisions to that effect. Besides various requirements to adhere to state vehicle regulations, Doc. 3-1 at 40, medication distribution requirements, *Id.* at 437, and autopsy procedures, *Id.* at 482, the contract requires GEO to "accept and provide for the secure custody, care and safekeeping of detainees in accordance with the State and local laws . . . applicable to the operations of the facility," *Id.* at 36. The Defendants argue that this catchall requirement removes any conflict between state and federal laws. And another contractual

requirement states that "where there is conflict in standards, the most stringent shall apply." *Id.* at 34.

But these requirements are plausibly read to include preexisting, generally applicable state laws currently in effect at the time of contract formation. Reading that provision to mean no state law of any type might be preempted would break the bargain struck between GEO and ICE. And HB 1276 contains substantially different requirements. For example, facility staffing levels are already determined and cannot be modified without ICE approval. Doc. 3-1 at 50. But HB 1276 gives Colorado the authority to require staffing changes. HB 1276 at 4.

GEO has conceded, for purposes of this case, that it is subject to the panoply of generally applicable laws and regulations that do not directly target this federal activity. For these reasons, to the extent then that HB 1276 goes beyond those requirements, it is likely to be preempted. This applies to the (i)(I)(D) provisions, which are already in effect.

## II. Preliminary Injunction

A preliminary injunction is an extraordinary remedy and is only justified where necessary to preserve the status quo or prevent irreparable harm until a full trial on the merits can be had. *Mrs. Fields Franchising, LLC*, 941 F.3d at 1232. Here, the full injunction sought by GEO is not necessary to do so.

First, I am persuaded by the County's argument that Section 2 of the bill does not materially change the County's authority or impose any significant new burden on GEO. The bill changes "shall have" to "has," and makes explicit that a county or district public health agency can "inspect or examine a facility that houses or detains individuals who are noncitizens for purposes of civil immigration proceedings." HB 1276 at 2. This is consistent with existing practice as well as all parties' views

of existing county authority. Doc. 23 at 5–6; Doc. 23-1 at 5 ¶¶ 10–11. And although the Although GEO expressed concern at the hearing about whether these changes actually increased some government authority, they appear to be in service of legislative clarity.[2] Section 2 will not be enjoined.

Second, the State's representation in its filings and at the hearing that the requirements in new subsection (dd)(1) are not in effect and will not be enforced until rulemaking occurs is sufficient to make an injunction unnecessary at this time. At the hearing, the state represented that it had no current plans to begin rulemaking, and the rulemaking typically lasts between three and six months. The requested injunction therefore is not necessary to prevent any imminent harm from subsection (dd)(1). *See Inslee,* 151 F.4th at 1115. Should enforcement of those provisions become imminent, this analysis might change.

That leaves the (i)(I)(D) provisions. Those are currently in effect, imposing actual burdens on GEO of more frequent and costly inspections enforced with penalties and as explained above, are likely to be preempted. As to the balance of equities and the public interest, these factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Defendants assert important interests in regulating the conditions of detainees housed within their borders, which is a significant interest indeed. But where a law is likely unconstitutional, the interests of the government "do not outweigh" the plaintiff's interest in having its constitutional rights protected. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). The

---

[2] To the extent this is so, it seems only to be in conjunction with the other provisions of SB 1276 at issue here. To the extent those provisions are enjoined, then, Section 2 does not cause any irreparable harm on its own.

interests of the government do not outweigh GEO's interest in having its constitutional rights protected. *Id.* This principle applies when the alleged constitutional infirmity is preemption. *Chamber of Com. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

And here, the impact on the government's legitimate interest is minimized in two significant ways. First, as pointed out above, GEO is not challenging the application of the many other health and safety regulations that exist outside of HB 1276. Second, GEO proposes an alternative remedy, noting that its contract to operate the Aurora facility expires on October 15, 2026, and suggesting that an injunction that expires on that date as well would be sufficient. Doc. 2 at 31. I agree. The provisions of any new contract that GEO (or another operator) obtains from the federal government may alter the analysis significantly, or make proceeding further with this case unnecessary at all. The appropriate relief, then, is an injunction through the end of the current contractual period.

**CONCLUSION**

It is ORDERED that:

The MOTION FOR PRELIMINARY INJUNCTION (Doc. 2) is GRANTED IN PART. The Defendants are enjoined from enforcing the amendments to subsection (i)(I)(D) in HB 26-1276 until the October 15, 2026 expiration of GEO's existing contract to operate the Aurora ICE Processing Center.

The motion is otherwise denied.

DATED: August 20, 2026

BY THE COURT:

Daniel D. Domenico
Chief United States District Judge